## The East Hartford Fire District *vs.* The Glastonbury Power Company et als.

First Judicial District, Hartford, October Term, 1917.
Prentice, C. J., Roraback, Wheeler, Beach and Shumway, Js.

An existing water-power, created and maintained under the provisions of the Flowage Act (General Statutes, §§ 982–991), is not for that reason protected from condemnation by a municipality under a general authority from the legislature to take the waters of any stream in that locality for its water-supply; at least when such water-power is not employed in some other public use at the time of the proposed taking.

A legislative grant to a private corporation of the limited powers which may be exercised by an individual under our Flowage Act, does not impair or modify *pro tanto* the general authority of condemnation theretofore conferred upon the municipality.

Property already devoted, or about to be devoted, to one public use, cannot be taken for another inconsistent public use, unless such taking be authorized either expressly or by clear implication.

A general intent to devote the property at some indefinite future time to some public use, is not, however, sufficient to protect it from condemnation.

In the present case it did not appear from the allegations of the answer, which was demurred to, that the respondent had done any work in constructing its authorized railway, or in generating electricity, or in developing its water-power, although twelve years had elapsed

East Hartford Fire District *v.* Glastonbury Power Co.

since it received its charter; and furthermore, it did appear from the charter of the respondent that its present intent to make use of the stream for generating electricity for public distribution and as the motive power for its railway, as alleged in its answer, might be subsequently changed, and the water-power applied to manufacturing, quarrying, or mining for its own private purposes. *Held* that under these circumstances it could not be said that the property had been devoted to a public use, and that it was, for that alleged reason, exempt from condemnation for a municipal water-supply.

Argued October 3d—decided December 15th, 1917.

APPLICATION for the appointment of a committee to assess just damages to the defendants for the proposed taking of the waters of Cold Brook in the town of Glastonbury in order to increase the plaintiff's water-supply, brought to and tried by the Superior Court in Hartford County, *Gager, J.*, upon a demurrer to the answer of the Glastonbury Power Company; the court sustained the demurrer and subsequently appointed a committee as prayed for, and from this judgment the Glastonbury Power Company appealed. *No error.*

The petitioner is a municipal corporation whose charter as amended in 1901 gave it general authority, reaffirmed in 1909, to take water from any brooks in the town of Glastonbury; and it brings this petition alleging that it is necessary for the purpose of increasing its water-supply to take water from Cold Brook, a tributary of Roaring Brook, in Glastonbury, and asking for the appointment of appraisers to assess just damage to certain lower riparian owners with whom it has been unable to agree.

The appealing respondent alleges in its answer that it was specially chartered by the General Assembly in 1905, and authorized to purchase and hold lands, mill-sites, etc., for the purpose of generating and distributing electricity, and to operate an electric railway as a

common carrier; that subsequent to the general grant of authority to the petitioner to take water from any brook in Glastonbury, the respondent was specifically authorized to build and maintain dams, etc., on Roaring Brook and its tributaries, in order to develop and utilize their water-power; that it has acquired, at great expense, lands, dams, ponds, etc., for the purpose of carrying out its above named powers, and is and has been for a long time engaged in making its preparations to engage in the above named business; that the waters of Cold Brook are essential to the proper carrying out of its purposes, and any substantial diversion of its waters would wholly prevent the respondent from pursuing its purposes, and destroy the entire value of its property; and that by its acts, and pursuant to lawful authority, the respondent had already appropriated the waters of Cold Brook and Roaring Brook to a public use, before this petition was brought.

The petitioner filed a general demurrer to the respondent's answer, and no objection being made to the form of the demurrer, the Superior Court sustained it on the ground that it did not appear from the pleadings and the Special Acts of the General Assembly referred to therein, that the respondent had any rights in the waters of Roaring Brook and its tributaries, which were not subject to condemnation, upon payment of just compensation, under the authority conferred upon the petitioner by its charter.

The respondent then refused to plead over and judgment was rendered according to the prayer of the petition.

*Robert P. Butler,* for the appellant (defendant Glastonbury Power Company).

*Percy S. Bryant,* for the appellee (plaintiff).

BEACH, J. The respondent claims that in 1905 it was specially authorized by its charter (14 Special Laws, p. 1090) to appropriate the waters of Roaring Brook and its tributaries; that this special grant modified *pro tanto* the prior general grant of authority to the petitioner to take water from any brook in the town of Glastonbury; that by acquiring the property and making the preparations alleged in its answer it had already appropriated these waters to a public use before this petition was brought; and that the petitioner cannot now take them for an inconsistent public use in the absence of any authority expressly or by clear implication empowering it to do so.

The respondent's corporate purposes, as expressed in its charter, are many and varied. It is given broad and general authority to operate all sorts of mines and quarries, and to carry on any kind of manufacture. It has authority to generate electricity and to distribute it within specified territory, and for that purpose to locate its poles and wires on highways and public grounds within such limits.

It has power to build and maintain dams, etc., on Roaring Brook and its tributaries for the purpose of providing the necessary ponds and reservoirs to improve, develop and utilize the power of said stream and its tributaries; and in that connection it is provided that "said company is hereby granted the powers conferred upon individuals by Chapter 65 of the General Statutes relating to flowage petitions, and said powers shall be exercised by said company subject to the provisions and restrictions of said chapter." It also has the power to build and operate a railway (otherwise than by steam) over a prescribed route, and by § 14 of the charter it is given power to take lands necessary for the construction of its railway as provided in § 3687 of the General Statutes.

It thus appears that the respondent's powers of eminent domain are different in degree and graduated according as one or another of its varied corporate purposes is to be exercised. As a railroad company it has the same power to take land necessary for the construction of its railway that other railroad companies have under the General Statutes. As an electric light and power company it has power to locate its wires and poles on highways and public grounds, but no power to condemn private property for that purpose. As a mill owner and developer of water-power on Roaring Brook, it has the same rights of flowage, subject to the same restrictions, that individuals have under the Flowage Act, but no other powers of eminent domain. Since the Flowage Act does not authorize the condemnation of land except for raceways, the authority to build dams on Roaring Brook is necessarily to be exercised on lands acquired by the consent of the grantors or lessors; and that being so, the charter gives the respondent no greater right or larger authority to develop the water-powers of Roaring Brook than those which any individual would possess who happened to own or lease the same property; namely, the right to build dams on its own land, and, under the Flowage Act, to flow the land of others so far as necessary, on paying actual damages plus fifty per cent. But this latter right is expressly required to be exercised "subject to the . . . restrictions of said chapter," among which is the proviso, contained in § 984 of the General Statutes that no such dam shall be erected to the injury of any existing mill or millsite not abandoned. Reading this restriction into the charter, it is manifest that the General Assembly did not grant, or intend to grant, to the respondent any special privileges in the matter of developing the water-powers of Roaring Brook, but only to give it all the

rights, and no more than the rights, of other individual riparian owners under existing general law.

This disposes of the respondent's claim that its charter contains a subsequent specific grant of authority to appropriate the waters of Roaring Brook, which operated as a modification of the petitioner's general authority to take water from any brook in Glastonbury.

The respondent's other claim, that it had already appropriated the waters of Roaring Brook to a public use before the filing of the petition and hence that the petitioner cannot take them for another public use unless thereto authorized expressly or by clear implication, is capable of two possible applications; one resting on the proposition that the development and maintenance of water-power is in itself a public use, and the other resting on the claim that the respondent's answer sufficiently alleges that it has appropriated these waters to the specific purposes of operating a railway and of distributing electricity among the public.

As to the proposition that the development and maintenance of water-power is in itself 'a public use within the meaning of the rule relied on by the respondent, it should be noted that it has long been the custom of the General Assembly to grant to public and private corporations, chartered for the purposes of municipal water-supply, general authority to take water from any source within specified limits. In *Water Commissioners* v. *Johnson*, 86 Conn. 151, 164, 84 Atl. 727, the validity of these general grants was affirmed, with the remark that if they were not valid "much, if not most, of our legislation empowering municipalities to provide water-supplies would fail." It is also notorious that practically all of our streams available for municipal water-supply were long ago utilized for water-power, either directly or through their connecting waters. It must therefore be sup-

posed that the General Assembly, in making these general grants, intended them to be operative upon streams already used for water-power. Such has been the common understanding of their effect, and, it must be held, that, by necessary implication, these grants of general power to take water from any brook within specified territory authorize the taking of water from existing water-powers, at least when such water-powers are not already employed in some other public use at the time of the proposed taking.

The respondent's claim that property already appropriated to one public use cannot afterward be taken for an inconsistent public use unless such taking is authorized either expressly or by clear implication, is undisputed. *Evergreen Cemetery Asso.* v. *New Haven,* 43 Conn. 234; *New Haven Water Co.* v. *Wallingford,* 72 Conn. 293, 44 Atl. 235; *Starr Burying Ground Asso.* v. *North Lane Cemetery Asso.,* 77 Conn. 83, 58 Atl. 467; *Water Commissioners* v. *Johnson,* 86 Conn. 151, 84 Atl. 727.

The rule applies to property which is about to be lawfully appropriated to a public use although the appropriation is not yet complete. *New Haven Water Co.* v. *Wallingford, supra.*

It is apparent, however, that the exercise of the sovereign right of eminent domain, when validly delegated for a proper purpose, ought not to be obstructed on the ground that the owner of the property in question intends to appropriate it to a public use at some future time, unless such intent is unmistakably evidenced by conduct which practically guarantees its speedy consummation. Accordingly it was held, in the case last cited, that the mere acquisition by the New Haven Water Company of land and water rights along a stream with a view to appropriating its waters for increasing the water-supply of New Haven, was

not a prior appropriation as against a municipality having only general authority to take water from any brook in that locality; because the conduct of the Water Company did not evidence an intent to take the water under its charter at present or in the near future, but only to take it at some indefinite time in the future whenever it should desire and determine to do so.

In the present case the respondent was chartered in 1905 as the successor in interest to a corporation of the same name already organized under the Corporation Act, and nevertheless it appears from the answer that it has not yet commenced to construct its railway, or to generate electricity, or to develop the water-power of Roaring Brook. It alleges that it is, and for a long time has been, making its preparations to develop these water-powers, but it does not allege that these preparations include any construction work either on the brook or in the territory where it proposes to distribute electricity, or in the construction of its railway; or that the preparations it is now making are any better calculated to produce quick results than those which it has "for a long time" been making. Furthermore, it is not alleged when construction work will be begun, not to say finished, or so far finished that some part of the waters of Roaring Brook will in fact be used for the purposes alleged.

In the language of *New Haven Water Co.* v. *Wallingford,* 72 Conn. 293 (44 Atl. 235) at page 304, these allegations "indicate at most a general and indefinite intent to utilize the property in some way, at some indefinite time, and to appropriate the water, under its charter, not at present or in the near future, but whenever it should desire and determine to do so later on."

Moreover, in that case, the Water Company had no right to use the water for any other purpose than

that of supplying the city of New Haven with water. So that the only uncertainty was as to the time when it would be so used. But in this case there is also another and more important uncertainty as to the use which the respondent may finally elect to make of its water-power when developed. True, it now intends to use it for the purposes alleged; but when this allegation of intent is referred to the respondent's charter, as it must be in order to ascertain its legal effect, it appears that the respondent is fully authorized to form a different corporate intent, and to use its water-power, whether translated into electric energy or not, for carrying on a mining, quarrying, or manufacturing business of a purely private nature, in case it should hereafter seem more profitable to do so.

In view of these uncertainties as to time and use, it cannot be said that the waters of Roaring Brook and its tributaries had been lawfully appropriated to a public use when this petition was filed.

This conclusion makes it unnecessary to discuss the question whether the generation of electricity for a public use by means of water-power is such an appropriation of the water to a public use that a water company generally authorized to take water from any source in that locality may not, upon paying just compensation, take some part of the water for a municipal water-supply.

There is no error.

In this opinion the other judges concurred.