CITY OF NEW HAVEN ET AL. *v.* TOWN OF EAST HAVEN ET AL.

SUPERIOR COURT    NEW HAVEN COUNTY    FILE NOS. 151328, 151329, 151330

Memorandum filed October 17, 1977

---

*Henry L. Fisher,* deputy corporation counsel, city of New Haven, and *Dennis L. Pieragostini,* deputy corporation counsel, city of New Haven, for the plaintiffs.

,Charles G. Albom, for the defendants.

BERDON, J. These consolidated cases are a continuance of the saga of the bitter conflict between the city of New Haven and the town of East Haven over Tweed-New Haven Airport (hereinafter referred to as the airport).[1] The airport is owned by the city of New Haven and is located within the city of New Haven and the town of East Haven. East Haven has been hostile toward the development of the airport and has for years sought its containment.

The defendants, the town of East Haven and the East Haven economic development commission[2] (sometimes hereinafter collectively referred to as East Haven), on November 19, 1976, instituted eminent domain proceedings to take three parcels of land, containing a total of seventy-two acres, located in East Haven, which are owned by New Haven and which are part of the airport's property. East Haven wishes to take this land as part of a 228-acre site it seeks to develop as an industrial park under the provisions of chapter 132 of the General Statutes, entitled "Municipal Development

---

[1] *East Haven* v. *New Haven,* 159 Conn. 453; *East Haven* v. *New Haven,* 168 Conn. 668; *East Haven* v. *Eastern Airlines, Inc.,* 331 F. Sup. 16 (D. Conn.), affirmed, 470 F.2d 148 (2d Cir.), cert. denied, 411 U.S. 965; *United States* v. *New Haven,* 367 F. Sup. 1338 (D. Conn.), affirmed, 496 F.2d 452 (2d Cir.), cert. denied, 419 U.S. 958; *United States* v. *New Haven,* 447 F.2d 972 (2d Cir.).

[2] The clerk of this court has also been added as a party defendant solely for the ancillary purpose of preventing him from issuing a certificate of taking prior to a final adjudication of these cases.

Projects."[3] Pursuant to this chapter, a municipality is authorized to "acquire by eminent domain" real property for this purpose. General Statutes § 8-193.

It is clear that the industrial park, if successful, could be important for the economic development of the town of East Haven and improve its tax base. The town has little industry and high unemployment. To date approximately $1,500,000 has been spent on the industrial park; the state has contributed one half of this amount and the town the remaining half. It is also clear that an industrial park adjacent to an airport is a compatible use.

The plaintiffs, the city of New Haven, the board of airport commissioners of the city of New Haven, and James E. Malarky, manager of the New Haven's department of airports (sometimes hereinafter collectively referred to as New Haven), have brought these present actions seeking to enjoin East Haven from taking the three parcels.[4] These three parcels,

---

[3] Under the provisions of chapter 132 of the General Statutes, the legislature has clearly set forth its policies and objections as follows:

"It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land and water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination." (General Statutes § 8-186.)

[4] At the commencement of these actions, the court issued in each case an ex parte temporary injunction prohibiting East Haven from taking said real property pending the outcome of the litigation.

containing seventy-two acres, lie in the southeasterly portion of the airport property. During the trial of this case and for purposes of this memorandum of decision, these parcels of land are described as "parcel A," "parcel B," and "parcel C."[5]

None of the parcels of land are presently being utilized by New Haven for actual airport operations, except for parcel B which is required for clear zone purposes and parcel C which is required for transition zone purposes.[6] East Haven seeks to take these parcels subject to clear zone and other height restrictions imposed by federal and state statutes and regulations.[7]

Before the merits of these actions are further explored, it would be helpful to review the history of the airport, the available facilities, and the services it presently provides. New Haven was authorized to establish an airport by the state legislature pursuant to the provisions of Special Acts 1927, No. 267 as amended by Special Acts 1929, No. 266. These special acts provided in part for the following: "The

[5] Parcel A is the subject matter of docket number 151328; parcel B of docket number 151329; and parcel C of docket number 151330.

[6] "Clear zone" is defined as follows: "A clear zone is a ground level area beyond the runway to be kept clear of vertical structures that could interfere with low-flying aircraft." *United States* v. *New Haven,* 367 F. Sup. 1338, 1339 n. 2; 14 C.F.R. 77.25 (1977).

"Transition zone" is a broader area of air space in which there may be obstructions which may affect air travel. 14 C.F.R. 71.13 (1977); 14 C.F.R. 77.25 (e) (1977).

[7] The certificate of taking for each parcel recites the following:

"The fee in said premises is hereby taken subject to:

(1) Various clear zone and height restrictions relating to Tweed-New Haven Airport. Said restrictions are more particularly delineated on a map entitled, 'Height Restrictions and Clear Zone Delineations, East Haven Industrial Park, East Haven, Connecticut,' Sheet 1 of 1, Department of Transportation, Bureau of Planning and Research, Wethersfield, Connecticut.

(2) All easements and/or restrictions imposed on same in favor of the Tweed-New Haven Airport under federal and state statutes and regulations pertaining to clear zone and height requirements."

city of New Haven is authorized to establish and maintain an airport within the limits of said city and the town of East Haven and to acquire property as a site for such airport, either by purchase or by condemnation proceedings under the provisions of the general statutes."[8]

The airport commenced its operations in 1931 as a turf airport without paved runways or navigational aids other than a few lights. It now consists of two paved runways which were constructed in 1941. The major runway, designated as runway 2-20,[9] is instrument controlled and runs in a southerly-northerly direction. This runway has been enlarged twice to its present length of 5600 feet, which was accomplished in 1967. The secondary runway, designated as runway 14-32, runs in a northwesterly-southeasterly direction. It has not been enlarged since its original construction and remains 4116 feet in length. The airport also consists of six taxiways, a control tower, aprons, a passenger terminal, an aircraft shop and hangar, a former military hangar used as a maintenance building, aircraft parking areas, and automobile parking areas.

The properties designated as parcels A and B and a portion of parcel C were acquired by the air-

---

[8] Although New Haven was originally authorized to take property for airport purposes by eminent domain in East Haven as well as in New Haven; Special Acts 1929, No. 266; this was changed by the adoption of legislation which prohibits the acquisition of property either by condemnation or purchase without the consent of the town wherein the property lies. General Statutes § 13b-43; see § 15-79 of the General Statutes, repealed by Public Acts 1969, No. 768 § 263; *East Haven* v. *New Haven,* 159 Conn. 453, 467.

[9] This is an international method of designating runways and the numbers correspond to the compass degrees without the last digit. So, in this case, runway 2-20 indicates that the southerly end of the runway is located at 20 degrees and the northerly end is located at 200 degrees.

port prior to 1940. The remainder of parcel C was purchased in 1967 in connection with the last extension of runway 2-20.[10]

The airport serves the greater New Haven area which contains approximately 750,000 people. It forms a part of the National Airport System Plan for the development of public airports in the United States which is prepared by the Federal Aviation Administration (hereinafter referred to as the "FAA") pursuant to the Airport and Airway Development Act of 1970, 49 U.S.C. §§ 1701 et seq. The airport's operating costs are financed out of the municipal budget of the city of New Haven. The capital improvements, land acquisition, and planning are financed by a combination of federal, state, and municipal revenues and grants. As of 1971 the federal government had invested in excess of $3,000,000 in developing the airport, the state of Connecticut in excess of $1,450,000, and the city of New Haven in excess of $3,500,000. The control tower at the airport is now directed by the FAA's personnel.

The airport was required to adopt an airport layout plan as a condition for receiving federal grants.[11] The latest plan was adopted by New Haven and approved by the state of Connecticut (by the then department of aeronautics) and by the

---

[10] The manner in which New Haven acquired the property is of no significance in determining the issues in this case. *Evergreen Cemetery Association* v. *New Haven*, 43 Conn. 234, 241.

[11] Grant agreement between the United States (FAA) and the city of New Haven, dated June 19, 1975, contract No. FA ANE 75-76, paragraph 25: "The Sponsor [New Haven] will keep up to date at all times an airport layout plan of the Airport showing (1) the boundaries of the Airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the Sponsor for airport purposes, and proposed additions thereto; (2) the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and roads), including all proposed extensions and

FAA in 1968. This airport layout plan shows that parcels A, B, and C are to be used in the future for the extension of runway 14-32, for clear zones, and for future general aviation development. As a prerequisite to receiving federal grants (and as recently as June 19, 1975), New Haven entered into agreements with the FAA which provided in part that all amendments, revisions, and modifications to the airport layout plan would be subject to the approval of the FAA. These agreements further provided that New Haven would not make or permit the making of any change other than in conformity with the airport layout plan if such change might adversely affect the safety, utility, and efficiency of the airport.[12]

Allegheny Airlines, an airline holding a certificate of convenience from the Civil Aeronautics Board, provides flight service to and from Washington, D.C. (through Islip, Long Island) and Boston. Pilgrim Airlines provides commuter service to Kennedy, LaGuardia, Boston, and Bradley Airports. New Haven Airways is the fixed-based operator at the airport which provides charter flights, service for private aircraft, sales, and other services. Eastern Airlines also presently holds a certificate of convenience issued by the Civil Aeronautics Board for service at the airport but Eastern suspended this service in 1974.

---

reductions of existing airport facilities; and (3) the location of all existing and proposed nonaviation areas and of all existing improvements thereon. Such airport layout plan and each amendment, revision, or modification thereof, shall be subject to the approval of the FAA, which approval shall be evidenced by the signature of a duly authorized representative of the FAA on the face of the airport layout plan. The Sponsor will not make or permit the making of any changes or alterations in the Airport or any of its facilities other than in conformity with the airport layout plan as so approved by the FAA, if such changes or alterations might adversely affect the safety, utility, or efficiency of the Airport."

[12] Note 11, supra.

During 1976 the airport served the following needs of the community: 28,000 passengers enplaned and deplaned on the certified airline, Allegheny; 20,700 passengers enplaned and deplaned on the commuter airline, Pilgrim; 600,000 pounds of air freight and over 1,000,000 pounds of air mail were handled through the airport; 75 to 80 aircraft were parked at the airport.

These consolidated cases seeking to enjoin East Haven are brought on several grounds, but the thrust of New Haven's major argument is that the real property cannot be taken by condemnation because it is already being devoted to a public use. It is a general rule of statutory construction, long recognized in Connecticut and most other jurisdictions, that property already devoted to a public use by one municipality cannot be taken under eminent domain by another municipality "where the proposed use will either destroy such existing use or interfere with it to such an extent as is tantamount to destruction . . . unless the legislature has authorized the acquisition either expressly or by necessary implication." 1 Nichols, Eminent Domain (3d Ed.) § 2.2; *Hiland* v. *Ives,* 154 Conn. 683, 689;[13] *Canzonetti* v. *New Britain,* 147 Conn. 478, 481; *Water Commissioners* v. *Johnson,* 86 Conn. 151, 163–64; *Starr Burying Ground Assn.* v. *North Lane*

---

[13] "[A] general grant of the power of eminent domain does not confer the power to take land already devoted to a public use. This rule is one of statutory interpretation and is applicable when the condemnor is a municipal or private corporation to which the state has delegated a portion of its sovereign power of eminent domain. [Citations omitted.] But the rule does not apply where the sovereign itself is the condemnor and is taking the property on its own behalf and for its own sovereign purposes. . . . The reason for the foregoing distinction in the applicable rules of statutory interpretation seems to be that it is not to be assumed, in the absence of a clear intention expressed or necessarily to be implied, that the sovereign, in delegating the power of eminent domain to a private or municipal corporation, intended to give the power to destroy a preexisting public use." *Hiland* v. *Ives,* 154 Conn. 683, 688–89.

*Cemetery Assn.,* 77 Conn. 83, 88; *Evergreen Cemetery Assn.* v. *New Haven,* 43 Conn. 234, 242; annot., "Condemnation — Of Public Entity's Land," 35 A.L.R.3d 1293, 1334. This rule of statutory construction has been at times referred to as the prior use doctrine.

It is also a rule of long standing in this state that the authority to take property by eminent domain will be strictly construed in favor of the owner and against the condemnor. "Authority to take by condemnation will be construed in favor of the condemnee and against the condemnor." *Torrington* v. *Coles,* 155 Conn. 199, 201; *State* v. *McCook,* 109 Conn. 621, 630.

The determination of whether a use is a public one is a judicial question which must be resolved by the court, but in this decision great weight must be given to the legislature's determination. *Gohld Realty Co.* v. *Hartford,* 141 Conn. 135, 141. "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. *McSorley* v. *Fitzgerald,* 359 Pa. 264, 270 . . .; 37 Am. Jur. 734, § 120. Courts as a general rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its peculiar circumstances. . . . The modern trend of authority is to expand and liberally construe the meaning of 'public purpose.' The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit." *Barnes* v. *New Haven,* 140 Conn. 8, 15.

None of the parties questions the fact that an airport facility is a public use; § 13b-43 of the Gen-

eral Statutes; Special Acts 1929, No. 266; *Town of Danbury* v. *Danbury Airport Corporation,* 9 Conn. Sup. 317, 318; or the fact that an industrial park developed by a municipality is also a public use. Section 8-186 of the General Statutes;[14] see *Wilson* v. *Connecticut Product Development Corporation,* 167 Conn. 111, 114-19.

It is also crystal clear that the statute granting to East Haven the power to take property by eminent domain for an industrial park does not expressly or implicitly authorize the condemnation of property already devoted to a public use. General Statutes §§ 8-193 and 8-129 through 8-133; see *Torrington* v. *Coles, supra,* 202-203. Such legislative authority "must be clearly and unequivocally expressed"; *Bridgeport* v. *N.Y. & N.H. R. Co.,* 36 Conn. 255, 265; or such authority must "be clearly inferred from the nature and situation of the proposed work, and from the impracticability of constructing it without encroaching on land already used by the public . . . ." 1 Nichols, Eminent Domain (3d Ed.) § 2.2; see *Canzonetti* v. *New Britain, supra,* 481.

East Haven argues that it has authority to take the land by condemnation because its taking will not interfere with the land's present public use, i.e., the taking will not interfere with the clear zones and other height requirements for the present operation of the airport. East Haven further contends that any other use that is proposed for the future will not prevent it from taking the property because there was no evidence of conduct on the part of New Haven "which practically guarantees its speedy consummation"[15] for such other public use.

---

[14] Note 3, supra.

[15] *East Hartford Fire District* v. *Glastonbury Power Co.,* 92 Conn. 217, 223.

The facts in the present case compel the court to conclude that parcels A, B, and C are being held not only to guarantee clear zones and other height requirements, but also for the public use of expansion of the airport facilities within the reasonably foreseeable future.[16] Even though the takings are subject to clear zones and other height restrictions required for the present operation of the airport, the condemnations by East Haven of parcels A, B, and C would still destroy an existing public use, that is, a reserve for the future expansion of the airport. Therefore, such a taking by East Haven would violate the prior use doctrine.

It has long been held that property "may be appropriated or devoted to a public use within the law of eminent domain without being actually put to such use." *Vermont Hydro-Electric Corporation v. Dunn,* 95 Vt. 144, 149.[17] "The prior use doctrine

[16] The designation of this property as being devoted to a public use by being held for future use is consistent with the legislature's definition of airport. " 'Airport' means any area of land or water, except a restricted landing area, which is designed for the landing and take-off of aircraft, whether or not facilities are provided for the shelter, servicing or repair of aircraft, or for receiving or discharging passengers or cargo, and all appurtenant areas *used or suitable* for airport buildings or other airport facilities, and all appurtenant rights-of-way." (Emphasis added.) General Statutes § 15-34 (7).

[17] The Supreme Court of Vermont in the case of *Vermont Hydro-Electric Corporation* v. *Dunn,* 95 Vt. 144, cites as authority in part the Connecticut case of *New Haven Water Co.* v. *Wallingford,* 72 Conn. 293. Although it is not entirely clear, the court in the *New Haven Water Co.* case indicates that *if* the trial court had found that the water company had manifested an intention to appropriate the water for its future use prior to the taking by the borough of Wallingford, then the court would have applied the prior use doctrine in favor of the water company. It is further noted that in the *New Haven Water Co.* case, the court did find that the taking of all the water of the stream by Wallingford, which amounted to a substantial quantity, there being an indication that the stream produced 6,000,000 gallons of water a day; id., 300; constituted a present public use even though Wallingford's total need was only 700,000 gallons per day; id., 295; which was also met in part from other sources.

applies to land held . . . to accommodate reasonably foreseeable future demands . . . although a mere naked possibility that it will be so used will not immunize it from condemnation under a general power." *Weehawken* v. *Erie Railroad Co.,* 20 N.J. 572, 583; *Chicago* v. *Vaccarro,* 408 Ill. 587;[18] *Ridgewood* v. *Glen Rock,* 15 N.J. Misc. 65; *In re 221st Street in City of New York,* 116 Misc. 506; *In re Seneca Avenue in City of New York,* 98 Misc. 712; *Richmond Heights* v. *Board of County Commissioners,* 112 Ohio App. 272; *Scranton Gas & Water Co.* v. *Delaware Lackawanna & Western Railroad Co.,* 225 Pa. 152; *Pittsburgh Junction Railroad Co.'s Appeal,* 122 Pa. 511; *Memphis State Line Railroad Co.* v. *Forest Hill Cemetery Co.,* 116 Tenn. 400; *Vermont Hydro-Electric Corporation* v. *Dunn,* supra; *Falkner* v. *Northern States Power Co.,* 75 Wis. 2d 116; annot., "Eminent Domain — Property Not Used," 12 A.L.R. 1502, 1506; 1 Nichols, Eminent Domain (3d Ed.) § 2.2 (5).

"In determining whether the . . . property is necessary for public use not only the present demands of the public, but those which may be fairly anticipated in the future, may be considered." *Rindge Co.* v. *Los Angeles,* 262 U.S. 700, 707. The test to protect the property from condemnation under the prior use doctrine is not absolute certainty that it will be used for that purpose in the future. Such a standard would be "too extreme

---

[18] In regard to the condemnation of property for airport improvement, the Supreme Court of Illinois in the case of *Chicago* v. *Vaccarro,* 408 Ill. 587, held the following: "It is, of course, permissible for the condemnor to take not only sufficient land for the present need, but it may, and should, anticipate the future increased demands for the public use to which the land is to be devoted. . . . The city of Chicago, in its determination of whether the taking of property is necessary for public use in providing parking facilities at the airport, has a right to and should consider not only the present needs of the public, but those which may be fairly anticipated in the future."

to be sustained. There will always be some possibility that a planned improvement will not be completed and put to the use intended. The test cannot be whether it is possible, whether it is conceivable that the project would fail. The test must be whether there is a reasonable assurance that the intended use will come to pass." *Falkner* v. *Northern States Power Co.,* supra.

In the present case, it is reasonable to conclude that there will be an increase in the demand for the services of the airport because of a predicted substantial growth in air traffic. This is due to an anticipated growth of the population in the area serviced by the airport.[19] Evidence was offered that by the years 1985 to 1995 there will be substantial increases in the number of enplaned passengers, in the amount of air freight movement, and in the number of aircraft based at the airport.[20]

These increases in the demands on the airport will require the expansion of airport facilities. Accordingly, it is anticipated that the land which East Haven seeks to condemn will be used for the following airport purposes within the reasonably foreseeable future (all of which are consistent with the approved airport layout plan):

---

[19] The demand for airport services is in part governed by the availability of the service. Accordingly, an increase in the frequency of air traffic so that better aircraft and schedules are provided will significantly increase the demand for the service at the airport.

[20] These predictions were set forth in "Final Report of a Master Plan for Tweed-New Haven Airport" prepared by R. Dixon Speas Associates, Inc., Manhasset, New York, dated December, 1975 (but prepared in 1972). Its predictions in 1972 for 1975 did not come to pass, but this was due in part to the temporary suspension of operations by Eastern Airlines in 1974. See note 19, supra. Notwithstanding this interruption of service, there is every reason to conclude that the long-range forecasts by R. Dixon Speas Associates are reasonable predictions of the demands that will be made on the airport in the future.

(a) It will be required that a new terminal be built by 1995 to increase the size of the present terminal from 6000 square feet to 80,000 square feet. This building is planned for the area where there is presently parking for based aircraft. Parcels A and B would, therefore, be required for parking the displaced aircraft as well as those additional aircraft which in the reasonably foreseeable future will seek parking at the airport.

(b) It is anticipated that runway 14-32 will be lengthened and as a result will require in part the use of parcel B. This will increase the airport capacity required to accommodate the demand for air traffic in the reasonably foreseeable future. Although it would be more desirable to increase the length of runway 2-20, under present circumstances (as will be explained in this memorandum of decision) the extension of 14-32 is the only viable option open to New Haven in order to increase the capacity of the airport.

(c) Parcel C is required for future general aviation purposes. For example, there will be need for additional hangars to house corporate aircraft.

(d) Parcels B and C are presently used for clear and transition zones. Notwithstanding the fact that East Haven seeks to take this property subject to these clear zone and other height requirements, it is apparently more desirable for the airport to own the land under these zones in fee simple. The airport, by federal regulations, is authorized to acquire land to maintain airport approach zones, including clear and transition zones. 14 C.F.R. 152.85 (d). The desirability of owning the fee simple to the land underlying the zones was clearly emphasized when East Haven clarified its position that it was seek-

ing to subject its taking to the *existing* clear zones and height requirements and not what may be required by the airport in the future.[21]

What is reasonably necessary to accommodate the future needs of the public use is also to be tested by the nature of the use. So, for example, if the public use is park land, future additional requirements of a municipality would not necessarily require that additional park land be contiguous to existing park land. But, on the other hand, if the public use is an airport and the anticipated future requirement is aircraft parking, it is, of course, essential that property contiguous to the present operating airport be available for this future need. Under such circumstances, there must be a liberal consideration of the future needs of the public use.

Of course, in the present case, it is necessary that the land for the future expansion be contiguous to the airport's present operation. It is of particular importance that New Haven be able to retain this property for its future airport needs inasmuch as it is improbable that other land will be available in East Haven. The legislature has made it clear that no land can be acquired in the future for the establishment, expansion, or improvement of an airport, either by condemnation or purchase, without the consent of the municipality in which the land lies.[22] General Statutes § 13b-43; *East Haven* v. *New Haven*, 159 Conn. 453, 467. And it has been made crystal clear that East Haven's hostility to any expansion of the airport will make the obtaining of its consent an improbability.

---

[21] East Haven set forth in its pretrial brief the following:

"The taking of the land is intended to be subject to *existing clear zones and not to future additional clear zones* New Haven may claim after the taking."

[22] Note 8, supra.

At one point in the seemingly improved relationship between the municipalities with respect to the airport, New Haven assumed that East Haven would cooperate in granting permission for certain improvements and expansion of the airport. Specifically, New Haven was under the impression that East Haven would give its consent to the condemnation or purchase of properties located in East Haven which have thereon certain obstructions that prohibit the effective use and extension of the length of runway 2-20,[23] to the purchase of certain land owned by East Haven which is necessary to improve the safety and reliability of the service at the airport by the completion of an approach light system, and to the acquisition of certain property on Twiss and Burgess Streets in East Haven for the purpose of aircraft parking and expanded accommodations for fixed-based operators. As a result of those assumptions, New Haven, in the preparation of its master plan, took into consideration the conveyance of parcels A, B, and C to East Haven for its industrial park.[24] The plan which was clearly subject to the foregoing assumptions was adopted by New Haven. The assumptions on the part of New Haven never came to fruition. As a result, it has become necessary for New Haven to retain parcels A, B, and C in order to accommodate, as best it can, these reasonably foreseeable future needs of the airport.

---

[23] An obstruction is an intrusion into the approach zone slope to the airport which interferes with the landing and takeoff of aircraft. On the north end of runway 2-20, the obstructions consist of certain trees, television antennae, etc. On the south end of runway 2-20, the obstruction consists of a building on land which is owned by the town of East Haven. As a result of these obstructions, the airport is prevented from accommodating aircraft which can carry a sufficient amount of fuel to accommodate the number of passengers who wish to fly nonstop to Washington, D.C. With the elimination of the obstructions and the extension of the runway by 900 feet on its existing property, the airport would be able to accommodate nonstop flights to Washington, D.C., Chicago, and other cities of similar distance.

[24] See note 20, supra.

Finally, a further public use test is to determine what the owner under the law is required to do with the property and whether a public trust is impressed upon it. *Vermont Hydro-Electric Corporation* v. *Dunn*, 95 Vt. 144. This standard is clearly set forth in a 1917 decision of the Supreme Court of Connecticut in the case of *East Hartford Fire District* v. *Glastonbury Power Co.*, 92 Conn. 217. Although East Haven relies upon the language of this case to support its position,[25] its reliance is misplaced.

In the *East Hartford Fire District* case the power company which owned the water rights, which the court allowed to be taken by eminent domain, was authorized to perform not only public service functions but also purely private functions such as operating mines and quarries and carrying on any other kind of manufacturing. Although the power company had been chartered for more than twelve years, it had not commenced any of its public service activities; it had not started to construct its railway, to generate electricity, or to develop the water rights for public use. The court, in allowing the fire district to take the water by eminent domain, pointed out that the power company was not obligated in the future to use the water for the public uses for which it was in part chartered. The court stated: "But in this case there is also another and more important uncertainty as to the use which the respondent [power company] may finally elect to make of its water-power when developed. True, it now intends to use it for the purposes alleged; but when this allegation of intent is referred to the respondent's charter, as it must be in order to ascer-

---

[25] "It is apparent, however, that the exercise of the sovereign right of eminent domain, when validly delegated for a proper purpose, ought not to be obstructed on the ground that the owner of the property in question intends to appropriate it to a public use at some future time, unless such intent is unmistakably evidenced by conduct which practically guarantees its speedy consummation." *East Hartford Fire District* v. *Glastonbury Power Co.*, 92 Conn. 217, 223.

tain its legal effect, it appears that the respondent is fully authorized to form a different corporate intent, and to use its water-power, whether translated into electric energy or not, for carrying on mining, quarry or manufacturing business of a purely private nature, in case it should hereafter seem more profitable to do so." *East Hartford Fire District* v. *Glastonbury Power Co.,* supra, 225. Of course, the present case is materially different. In this case the land is owned by the city of New Haven and is being held for the public purpose of future reasonable expansion of airport facilities. The parcels of land are part of the airport's layout plan which has been approved by the FAA and the state of Connecticut. New Haven is obligated to use this land for airport purposes pursuant to certain grant agreements it entered into with the FAA.[26] The land in question is certainly impressed with a public trust.

The court is also of the opinion that the taking of parcels A, B, and C is not necessary for East Haven to have a successful industrial park.[27] It seeks the fee to those parcels for the purposes of constructing a road and installing utilities for the park. The utilities can be brought to the property through Silver Sands Road and the proposed road is not essential for the development of the park.[28]

East Haven's engineer also points out that parcel B is absolutely necessary because East Haven plans

---

[26] See note 11, supra.

[27] Under any circumstances, no more than an easement would be necessary to accomplish these purposes. Instead East Haven seeks to take the fee simple of approximately 72 acres of land subject to certain height requirements.

[28] Very small portions of parcels B and C, totaling two to three acres, have been included in options granted to prospective purchasers in the industrial park, but East Haven is under no obligation pertaining to these small parcels if it does not own them. It is clear that the failure to deliver these few acres to the prospective owners would not hinder the development of the park or jeopardize these prospective occupants.

to use the materials it removes from a cliff located thereon as fill for the marsh lands of that portion of the industrial park presently owned by East Haven. He contends that without these vast quantities of fill available in close proximity to the site, the industrial park would not be economically feasible. On the other hand, East Haven argues that it is not economically feasible for New Haven to remove this same cliff which would be required for the purpose of extending runway 14-32. Under such circumstances, if East Haven's motive in attempting to condemn the three parcels was solely the development of an industrial park (and not the containment of the airport, as New Haven claims),[29] it would appear that East Haven should seek to acquire from New Haven this property for the sole purpose of removing this cliff. By limiting its acquisition, East Haven would serve its purpose of providing fill for the remainder of the industrial park and at the same time accommodate New Haven by removing the cliff and making the extension of runway 14-32 more economically feasible. Certainly the taking of the cliff on parcel B for the purpose of removing it for fill would not conflict with the present public uses of the land in question.

In sum, the court finds (1) that parcels A, B, and C, which East Haven seeks to take under eminent domain are already devoted to an existing public

[29] New Haven claims that one of the motives of East Haven in developing the industrial park is the containment of the airport. The original plan of East Haven was to develop a 500-acre industrial park which would have included a substantial amount of airport property. In the words of the state's manager of aeronautics planning of the department of transportation, this plan would have "pretty well shut the airport down," and it was rejected by the state development commission (the state agency which then had authority to approve state funding for industrial parks). Although the court is convinced that the containment of the airport is an objective of East Haven, the development of the industrial park for improving East Haven's economy and tax base is its primary purpose.

use, that is, they are being held for the reasonably foreseeable future expansion of the airport; (2) that the proposed use of these parcels of land as part of an industrial park, for which East Haven seeks to take them in fee simple, would destroy such existing public use; (3) that the legislature of the state of Connecticut did not expressly, or by implication, authorize East Haven to take such land already devoted to a public use; and (4) that if the court does not issue permanent injunctions restraining East Haven from proceeding further in its attempt to acquire parcels A, B, and C, New Haven will be irreparably injured.[30]

Accordingly, the court does hereby issue permanent injunctions prohibiting the defendants, the town of East Haven and the East Haven economic development commission, from taking by condemnation parcels A, B, and C, as prayed for in each of the complaints; and, further, the defendant clerk of the Superior Court of the state of Connecticut in and for the county of New Haven is permanently enjoined from issuing certificates of taking with respect to these parcels of real property.

Judgment may enter accordingly.

---

[30] New Haven seeks to enjoin East Haven's taking of the three parcels on other grounds. They include, inter alia, the following: (a) Airport property which is included in the airport layout plan cannot be taken by eminent domain without the approval of the FAA, pursuant to certain grant agreements; see note 11, supra; General Statutes § 13b-15 (b); and (b) East Haven violated the provisions of its development plan by failing to make reasonable efforts to acquire the property by negotiations with New Haven, but instead resorted to condemnation proceedings. See *New York, N.H. & H. R. Co.* v. *Levy,* 69 Conn. 424, 428. It was anticipated by the state development commission that East Haven would first attempt to obtain the property by negotiation. Indeed, negotiation in this case was important and would have served the needs of both communities.

These arguments of New Haven have merit, but in view of the court's decision on the public use issue, the court will not discuss the same further.