[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed July 11, 1997
I. INTRODUCTION
Airports are not popular neighbors. "As anyone who has lived near or visited an airport can attest, aircraft noise can seriously interfere with sleep, speech, and normal community activity." Jay M. Zitter, Annotation, Airport Operations orFlight of Aircraft as Constituting Taking or Damaging ofProperty, 22 A.L.R. 4th 863, 867 (1983). The plaintiffs in this case, Richard and Donna Melillo (the "Melillos"), share this point of view. They contend that their residential property has been the subject of a taking, for constitutional purposes, by jet aircraft flights landing at and departing from Tweed-New Haven Airport (the "Airport"). For the reasons explained below, I do not find that the Melillos have established their claim.
II. Procedural Background
This action was commenced in 1988. The Melillos are the sole plaintiffs. The City of New Haven, which owns and operates the Airport, is the sole defendant.
The Melillos' amended complaint contains four counts. All four counts contend that the Melillos' enjoyment of their property has been interfered with by jet flights to and from the Airport commenced by Air Wisconsin Inc. on November 10, 1984. Count I claims that this interference amounts to a taking of property for public use without just compensation in violation of ArticleFirst, §§ 10 11 of the Connecticut Constitution. Count II is phrased as an alternative to Count I. In the event that "Connecticut does not provide a constitutionally adequate procedure for redressing the taking of plaintiffs' property for public use without just compensation," Count II claims that the actions in question constitute a taking of property for public use without just compensation in violation of the Fifth and Fourteenth Amendments to the Federal Constitution. Count III alleges a violation of the Federal Uniform Relocation Assistance Real Property Acquisition Policies Act of 1970 (the "URA").42 U.S.C. § 4601, et seq. Count IV alleges a violation of CT Page 7225 Connecticut's municipal airports statute. Conn. Gen. Stat. §13b-43.
The City of New Haven has asserted a number of special defenses. In view of my conclusion that the Melillos have failed to establish liability on any of their claims, it is unnecessary to describe or analyze the special defenses.
An evidentiary hearing was held over the course of four days in January and March 1997. Following the trial, the parties submitted extensive briefs. Oral argument occurred on June 24, 1997. The following findings of fact and conclusions at law are now made.
III. FINDINGS OF FACT.
A. The Property.
The property in question is 177 Burr Street in East Haven ("the Property"). The Property is a small residential lot, measuring 100' x 125', containing a modest single-family ranch house. The house was built in 1959. The Melillos purchased the property for $60,000 on September 27, 1979. They have owned it and resided in it since that time.
The Property is approximately 450 feet north of the northern boundary of the Airport. The northern edge of the Airport's north-south runway lies a few hundred feet south of this boundary. An imaginary line drawn along this runway and continuing north would go within a few feet of the Property. Airplanes approaching the north-south runway from the north or taking off from this runway in a northerly direction almost directly over the Property.
B. The Airport
The Airport has been the subject of much litigation over the years, and many of its relevant characteristics are described in published judicial opinions. As our Supreme Court has noted, the Airport is "owned and operated by the City of New Haven and [is] located in New Haven and East Haven." Town of East Haven v. Cityof New Haven, 159 Conn. 453, 455, 271 A.2d 110 (1970). It was established pursuant to special acts passed by the legislature in 1927 and 1929. Id.
The physical layout and early history of the Airport have been succinctly described as follows:
The airport commenced its operations in 1931 as a turf CT Page 7226 airport without paved runways or navigational aids other than a few lights. It now consists of two paved runways which were constructed in 1941. The major runway, designated as runway 2-20, is instrument controlled and runs in a southerly-northerly direction. This runway has been enlarged twice to its present length of 5600 feet, which was accomplished in 1967. The secondary runway, designated as runway 14-32, runs in a northwesterly-southeasterly direction. It has not been enlarged since its original construction and remains 4116 feet in length. The airport also consists of six taxi-ways, a control tower, aprons, a passenger terminal, an aircraft shop and hangar, a former military hangar used as a maintenance building, aircraft parking areas, and automobile parking areas.
City of New Haven v. Town of East Haven, 35 Conn. Sup. 157, 161,402 A.2d 345 (1977)(Berdon, J.) (footnote omitted), aff'd,177 Conn. 749, 419 A.2d 349 (1979).
The evidence in this case establishes that this description remains essentially accurate. On January 31, 1984, the State of Connecticut and the City of New Haven signed an agreement in which the State promised to reimburse the City 75 percent of the cost of an airport improvement project involving the acquisition of nearby land. The Property was considered for purchase under this agreement but was ultimately not purchased. The plaintiffs admit that there has been no actual enlargement of the north-south runway since 1967. Plaintiffs' brief at 42.
C. Use of the Airport
The history of aircraft using the Airport is of great importance in this case. The early use of the airport has been described by the United States District Court for the District of Connecticut as follows:
 The first commercial airline to serve Tweed-New Haven Airport was American Airlines which began operations in October 1934 and continued until 1937, resumed in November 1941 and continued until May 1942, when all operations were suspended by the war. During the war period the airport was used by the Army Air Force as an air base. American Airlines resumed operations in 1946 and continued until April 1960. Throughout these years it operated piston-driven propeller CT Page 7227 aircraft of various types.
Town of East Haven v. Eastern Airlines, Inc., 331 F. Sup. 16, 20
(D.Conn. 1971), aff'd, 470 F.2d 148 (2d Cir. 1972), cert.denied, 411 U.S. 965 (1973) (hereinafter referred to as "EasternAirlines"). The use of jets at the Airport began in 1967. AsEastern Airlines recounts, Eastern Airlines used DC-9s and Boeing 727s from October 29, 1967 to January 4, 1968. It resumed these flights on June 17, 1970. 331 F. Supp. at 21.
The evidence in this case confirms the essential accuracy of this description. It further establishes that the Eastern Airlines flights continued until approximately 1975, when they ceased. (Testimony of Edgar Schoonmaker.)
The jet flights from 1967 to 1975 caused distress and annoyance to the residents living below the flight path and in some cases caused physical damage to the residents' real property. Eastern Airlines, supra. 331 F. Supp. at 29. EasternAirlines held that seven properties that were virtually directly under the flight path of these jets in close proximity to the Airport were the subject of a compensable "taking" within the meaning of the Fifth Amendment. The status of 177 Burr Street was not litigated in Eastern Airlines. In spite of this fact, the evidence submitted in this case leads irresistibly to the conclusion that the Property was the subject of significant direct low altitude jet overflight from 1967 to 1975. The reason for this conclusion is the Property's close proximity to the north-south runway. Given that physical proximity, the Property could hardly avoid low altitude jet overflight from the Airport.
As already mentioned, jet flights at the Airport ceased in approximately 1975. The Melillos purchased the Property in 1979. At that time, there was no jet service to and from the Airport. There was, of course, a substantial amount of non-jet flight but that was, comparatively speaking, less disruptive to the neighborhood.
Mr. Melillo testified at trial that he had seen an article in a local newspaper at about this time quoting the then-mayor of New Haven as saying that jet service would not be resumed at the Airport. No such news report, much less any authenticated mayoral statement, was submitted into evidence. Under these circumstances, I cannot make a finding that any such statement was ever made.
Mr. Melillo was born in 1942 and has lived in East Haven all of his life. Given this life history, he has had, at a minimum, constructive notice of the Airport's general use during the past three decades. In addition, anyone purchasing the Property at any time during this period could easily have learned that it was only 450 feet from an airport.
The Melillos do not claim to have been disturbed by the Airport's CT Page 7228 use during the first five years of their ownership of the Property. The problem, in their estimation, began in the fall of 1984 when Air Wisconsin began flying British Airways BAE-146 jet passenger aircraft into the Airport.
More specifically, Air Wisconsin flew a test flight into the Airport on November 10, 1984. Regular passenger service began on February 5, 1985. This continued until December 1986, when Air Wisconsin ceased operations at the Airport. As far as the record indicates, there has been no significant jet service to the Airport since December 1986.
As already mentioned, the Melillos' specific claim in this case is that the Property was taken, for constitutional purposes, by the Air Wisconsin jet flights. These flights must consequently be somewhat more fully described. The regular service, as just mentioned, lasted from February 1985 to December 1986. A table in evidence shows that 32 Air Wisconsin flights landed at the Airport in February 1985 and that there were between 69 and 102 Air Wisconsin landings per month from March 1985 to April 1986. The landings decreased to the 40-50 per month level from May to July 1986. From August to October 1986 they picked up enormously. There were 160 landings in August, 158 in September and 134 in October. At that point, Air Wisconsin's service slowed to a trickle. There were 11 landings in November and 13 in December 1986, when the service ceased.
These figures, as I understand them, represent only landings. There were, needless to say, takeoffs as well. Landings, however, are somewhat more disruptive to the neighborhood than takeoffs, since takeoffs are performed at steeper angles. There are, however, two other considerations that lessen the impact of these figures — which are for the airport as a whole — on the Property. First, the Airport has two runways. Second, the north-south runway — the one in question here — is used in both directions. The evidence does not permit exact calculation of the percentage of flights landing on and taking off from the north end at the north-south runway during the period in question. In very rough terms, about half of the total number of Air Wisconsin flights used each runway and, again very roughly, about half of the total flights using the north-south runway used the north end of the strip. Thus, about a quarter of Air Wisconsin's total flights used the north end of the north-south runway during the period in question.
The noise and turbulence of the Air Wisconsin Flights cannot be calibrated exactly, at least upon the evidence in the record. CT Page 7229 (No actual measurements were submitted by the parties.) Many Air Wisconsin flights — particularly the landings — were at an altitude of less than 100 feet over the Property. Their noise and turbulence substantially interfered with the Melillos' enjoyment of the Property and caused some minor physical damage — such as loosened shingles — to the Property.
The record also does not allow exact comparison between the Air Wisconsin flights from 1984 to 1986 and the earlier Eastern Airlines flights from 1967 to 1975. The credible evidence suggests that the 727s used from 1967 to 1975 were noisier than the BAE 146s used from 1984 to 1986. Many Air Wisconsin flights, however, used an airbrake that increased their noise and turbulence. On the basis of all of the credible evidence, it appears that the noise and turbulence of the respective series of flights were roughly the same.
D. Economic Effect on the Property
The evidence does not support a finding that the value of the Property was significantly altered by the Air Wisconsin flights. The testimony of the plaintiffs' expert to the contrary — unsupported by any written report — was not credible. The value of the Property has undoubtedly been lessened by virtue of the Property's proximity to the Airport, but that was the case in 1979 when the Melillos purchased it. To state the matter another way, I cannot find that the Melillos have sustained any significant economic damage as a result of the Air Wisconsin flights.
IV. CONCLUSIONS OF LAW
A. Count I
Count I of the Amended Complaint, as mentioned, alleges that the Air Wisconsin flights described above resulted in a taking of the Property in violation of Article First, §§ 10 and 11 of the Connecticut Constitution. The plaintiffs have not separately briefed their claim under Article First, § 10, which guarantees the right of redress for injuries, and that claim is deemed abandoned. They have, in contrast, vigorously pursued their claim under Article First, § 11, which provides that, "The property of no person shall be taken for public use, without just compensation therefor."
The first question that must be addressed, in view of the wording of the alternative Count II described above, is whether Connecticut provides a CT Page 7230 constitutionally adequate procedure for redressing the taking of property for public use without just compensation. In spite of the arguable absence of explicit statutory authority, the answer to this question is plainly in the affirmative. As our Supreme Court emphatically said almost a century ago, the Constitution contains such a provision, "and that is enough." McKeon v. NewYork, N.H. H.R.R., 75 Conn. 343, 348, 53 A. 656 (1902), aff'd,189 U.S. 508 (1903). "In view of the constitutional provision referred to, no statutory provision is necessary to entitle one to recover compensation." Anselmo v. Cox, 135 Conn. 78, 81,60 A.2d 767, cert. denied, 335 U.S. 859 (1948).
The real question is not whether Connecticut provides an adequate procedure to redress a taking, for it assuredly does, but whether a taking has occurred in this case. I cannot find on this evidence that a taking has occurred.
The central problem in this case can be briefly summarized. There have been two periods of significant jet activity over the Property in the last thirty years. The first was from 1967 to 1975. The second was from 1984 to 1986. The Melillos, who purchased the Property in 1979, claim that the second period of jet activity has resulted in a taking. As described above, I am unable, on the evidence presented, to make a finding that the second period of jet activity was more disruptive to the enjoyment of property rights than the first. How, on these facts, can the second period of jet activity have taken anything that had not already been taken by the first period of jet activity?
This would, analytically, have been a comparatively easy matter if the plaintiffs had proceeded on a theory of temporary taking. Although the law of temporary takings is not without its problems, there is authority for the proposition that a temporary taking is nevertheless a taking and that the transient nature of a temporary taking "is only important in determining the amount of compensation to which [the owner] is entitled." McKeon v. NewYork. N.H. H.R.R., supra, 75 Conn. at 347. Under such a theory, which would seem justified from a historical perspective, the Property might be considered as having been temporarily taken from 1967 to 1975 and again temporarily taken from 1984 to 1986, with the Melillos, who owned the Property only during the second period, entitled to compensation for only that latter period. The plaintiffs, however, have unambiguously declined to pursue such a claim. They vigorously argue, to the contrary, that the jet a activity is the subject of their complaint — namely the CT Page 7231 second period of jet activity — resulted in a permanent
taking of the Property. To bolster their argument, they rely uponEastern Airlines, which holds that the first period of jet activity resulted in just such a permanent taking. Given this posture, the court can rule for the plaintiffs only if it finds a permanent taking.
In relying upon Eastern Airlines, however, the plaintiffs are hoist with their own petard. To the extent that Eastern Airlines
is persuasive, it is authority for the proposition that the Property was taken by the first period of jet activity, from 1967 to 1975. If this is the case, the Property was already permanently taken when the Melillos purchased it in 1979, and the persons entitled to recover for this taking are not the Melillos but the unidentified owners of the Property from 1967 to 1975.
This is not, of course, a matter of res judicata, sinceEastern Airlines did not consider the status of the Property. As previously discussed, however, the evidence submitted in the present case leaves no doubt that the Property, by virtue of its location, was necessarily subjected to low altitude jet overflight from 1967 to 1975. Under these circumstances, the taking in this case occurred when the Airport first opened to jet traffic. This event, in all likelihood, occurred in 1967, although its precise timing is unimportant. The important fact — clearly established by the evidence in this case — is that this event occurred prior to the Melillos' 1979 purchase of the Property. The Melillos cannot recover for this taking.
The Melillos dispute this proposition. In their view, a subsequent owner can recover for a permanent taking even when the property in question has already been permanently taken under a prior owner. This argument must be carefully scrutinized, for it has both acceptable and unacceptable applications. It can be readily admitted that the plaintiffs' theory could be acceptably applied in some situations not present here. Suppose, for example, that the second period of jet activity, from 1984 to 1986, had been significantly more intense than the first period of jet activity, from 1967 to 1975. In that case, it would be permissible to view the Property having been permanently "taken" by moderate jet overflights from 1967 to 1975 and then permanently "taken" to an even greater extent by the substantially more severe jet overflights from 1984 to 1986. The Second Circuit hinted at just such an approach in EasternAirlines when it expressly left open the question "whether a CT Page 7232substantial variation from the type of air service in effect at the time of the District Court trial will cause further harm."470 F.2d at 151. (Emphasis in original.) That theory, however, depends upon a finding of "a substantial variation." For reasons already explained, no such variation is found here.
In the absence of a finding of "a substantial variation," the plaintiffs' theory cannot be sustained. If, as I have found in this case, the second period of jet activity is no more disruptive than the first, no additional taking has occurred. The only permanent taking is the first one. Under these circumstances, the plaintiffs cannot recover. The reason for this conclusion is that the plaintiffs can recover for a taking only if the taking occurred during their ownership of the Property. United States v.Dow, 357 U.S. 17, 20, (1958). "For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."Danforth v. United States, 308 U.S. 271, 284 (1939). "[T]he right to an inverse condemnation remedy does not pass to subsequent purchasers after the inverse condemnation." Knight v. City ofBillings, 642 P.2d 141, 147 (Mont. 1982). Thus, "[a]bsent an assignment of that owner's rights, subsequent purchasers of the property are not entitled to recover." 6A Julius L. Sackman,Nichols on Eminent Domain § 36.01[5] at 36-14 (3d ed. 1997). To the extent that the Property was taken by jet overflights from 1967 to 1975, the plaintiffs in this case consequently cannot recover.
The plaintiffs answer this argument by pointing out that, under Connecticut law, a navigation easement may be acquired by prescription only in narrow circumstances not present here.County of Westchester v. Town of Greenwich, 227 Conn. 495,629 A.2d 1084 (1993). But this observation, while true, is beside the point. The absence of a prescriptive easement does not preclude the presence of a taking. Westchester did not involve low altitude overflights of the type involved in Eastern Airline. The record in Westchester did "not include any facts to suggest . . . that the overflights had, in any manner, harmed the [owners'] trees or otherwise interfered with the use and enjoyment of the [owners'] properties." 227 Conn. at 504. If the flights had been "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land," a taking would have resulted from that fact alone. Id. at 504 n. 14 (quoting United States v. Causby, 328 U.S. 256, 266 (1946)).Eastern Airlines is obviously authority to the same effect. CT Page 7233
We are left with the dilemma with which we began. Although the plaintiffs could arguably prove a temporary taking on the facts of this case, they quite plainly make no such claim. They claim a permanent taking. Any permanent taking that has occurred, however, occurred when the Airport opened to jet flight in 1967 or shortly thereafter. The Melillos did not own the Property then and cannot recover for that taking. They have made no showing of a substantial variation between the first series of jet overflights, from 1967 to 1975, and the second series of jet overflights, from 1984 to 1986. They consequently cannot recover on Count I.
B. Count II
As described above, Count II is pled in the alternative. It can only be reached in the event that "Connecticut does not provide a constitutionally adequate procedure for redressing the taking of plaintiffs' property for public use without just compensation." As explained above, however, this predicate has not been established. Connecticut provides a constitutionally adequate procedure. The plaintiffs simply cannot prevail as a matter of substantive law. In any event, for reasons already explained, the plaintiffs could not prevail under federal substantive law even if the merits of Count II were reached.
C. Count III
Count III alleges a violation of the URA. The URA provides certain compensation to "displaced persons." "Displaced person" is a term of art. It is defined in 42 U.S.C. § 4601
(6)(A)(i)(ii) as "any person who moves from real property, or moves his personal property from real property."
The Melillos are not "displaced persons" within the meaning of the URA. They have not "move[d] from real property" since they moved into the Property in 1979. Not only did they not move as a result of the Air Wisconsin flights complained of from 1984 to 1986, but they have not moved since. Under these circumstances, they cannot recover under the URA.
D. Count IV
Count IV alleges a violation of Connecticut's municipal airports statute. Conn. Gen. Stat. § 13b-43. (The plaintiffs' brief pertaining to this count also alleges a violation of Conn. CT Page 7234 Gen. Stat. § 15-73, but that separate statutory claim is nowhere asserted in their amended complaint and must consequently be disregarded.) Sec. 13b-43 provides, in relevant part, that "[a]ny municipality . . . may expand or improve an airport, and may take any land or interest therein necessary for such expansion or improvement . . . upon paying just compensation to the owner of such land or interest therein." Sec. 13b-43
"requir[es] compensation whether or not the acts of the . . . municipality amount to a constitutional `taking.'" Powers v.Ulichny, 185 Conn. 145, 151 n. 5, 440 A.2d 885 (1981). Powers
holds that "obtaining a permanent injunction with respect to an airport hazard is the functional equivalent of acquiring an interest in the hazard." Id. at 155. Has the City accomplished such a "functional equivalent" here?
The plaintiffs' precise factual claim in this regard is somewhat elusive. Their amended complaint alleges a smorgasbord of alleged acquisitions, mostly construction of improvements such as parking areas and fences within the confines of the Airport itself that could have no significant impact on the Property. The evidence submitted on this issue is, in any event, considerably more modest.
The plaintiffs seemingly argue that the Property has been acquired, for statutory purposes, by the 1984 agreement between the State and the City for future, enlargement of the Airport. As described above, however, the Property has not been acquired under that agreement, and the north-south runway has not been enlarged. The plaintiffs also seemingly argue, more generally, that their home has been acquired by the air traffic that is the focal point of this case. For reasons already described, this claim cannot be substantiated. Nothing comparable to either a constitutional taking or a permanent injunction is shown by the evidence here. The plaintiffs consequently cannot recover under the municipal airports statute.
II. CONCLUSION
For the reasons discussed above, judgment shall enter for the defendant on all counts.
Blue, J. CT Page 7235
[EDITORS' NOTE: THE CASE THAT PREVIOUSLY APPEARED ON THIS PAGE HAS BEEN MOVED TO CONN. SUP. PUBLISHED OPINIONS.] CT Page 7242