NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 83

No. 2016-396

| | |
|---|---|
| In re Vermont Gas Systems, Inc. | Supreme Court |
| (William Marks, Nancy Baker, Linda Gage, | |
| Rachael Smolker, Melanie Pulley, Stephanie Spencer, | On Appeal from |
| and Lawrence Shelton, Appellants) | Public Service Board |
| | |
| | April Term, 2017 |

James Volz, Chair

Robert E. Woolmington and John D. Stasny of Woolmington, Campbell, Bernal & Bent, P.C.,
 Manchester Center, and James A. Dumont of Law Office of James A. Dumont, P.C., Bristol,
 for Appellants.

R. Jeffrey Behm and Justin A. Brown of Sheehey Furlong & Behm P.C., and William J. Dodge
 of Downs Rachlin Martin PLLC, Burlington, for Appellee Vermont Gas Systems, Inc.

Louise C. Porter, Montpelier, for Appellee Department of Public Service.


PRESENT: Skoglund, Robinson, Eaton and Carroll, JJ., and Burgess, J. (Ret.),
 Specially Assigned


¶ 1. **ROBINSON, J.** This appeal requires us to decide whether land dedicated to a public use may be condemned for another public use when the new use does not materially interfere with the prior use. Intervenors, a group of Hinesburg residents who use Geprags Park, appeal the Public Service Board's order authorizing Vermont Gas Systems, Inc. (VGS) to condemn an easement through the park for the purpose of installing a natural gas pipeline. They argue that the Board erred in authorizing the condemnation in light of the fact that the park was already dedicated to a public use, and in concluding that the condemnation was necessary under 30 V.S.A.

§ 112(a)(2). We affirm the Board's decision on the issues raised in this appeal, but remand for a minor correction to the order relating to the terms of the easement.

¶ 2. The following background facts provide context to this appeal. VGS had previously constructed a pipeline from the Canadian border to Burlington, was providing natural gas services to customers in Chittenden and Franklin counties, and sought to expand its services to customers in Addison County. In December 2012, VGS filed a petition with the Board for approval of a forty-one mile pipeline expansion that would run from Colchester to Middlebury. Under 30 V.S.A. § 248(a)(3), VGS could not commence construction unless the Board concluded that the pipeline would promote the general good of the state and issued a certificate of public good (CPG) authorizing the project. Throughout the CPG proceedings, VGS's proposed route for the expansion included a segment that went through Geprags Park in Hinesburg. The Board concluded that the project satisfied the eleven criteria established in § 248(b). It determined that the project would not impose undue negative consequences on any of the affected regions and identified several benefits that would flow from the project, including lower energy costs and a decrease in greenhouse gas emissions. The Board ultimately concluded that the pipeline would promote the general good of the state and issued a CPG in December 2013. VGS began constructing the pipeline expansion in the summer of 2014.

¶ 3. The undisputed facts concerning the immediate appeal are as follows. Dora Geprags devised the park at issue to the Town of Hinesburg in 1991. A covenant in the decree of distribution provides that, "the property decreed hereby shall be used only as a public park or school or for public recreational or educational purposes." The park covers approximately eighty-five and a half acres and contains a barn, a sledding hill, and walking trails. VGS sought an easement through this park in order to complete its pipeline expansion, but the Town would not voluntarily convey the easement to VGS because it determined that the decree's covenant

2

restricted its ability to do so. Subsequently, VGS and the Town stipulated to condemnation of an easement through the park for the pipeline.

¶ 4. In October 2015, VGS filed a petition of condemnation with the Board, seeking to condemn a 1987-foot-long and fifty-foot-wide easement that runs north to south on the western side of the park. By that time, VGS had acquired easement rights from all other property owners along the pipeline route, prepared the pipeline corridor up to the northern and southern boundaries of the park, and begun construction of the pipeline on other parts of the route; the easement through the park was the last segment of the pipeline route that VGS needed to acquire to complete construction of the expansion.

¶ 5. In March 2016, several residents of the Town and the Hinesburg Conservation Commission filed motions to intervene in the proceeding. The Board initially denied these motions but after the intervenors filed a motion to reconsider, it allowed some, but not all, of the movants to intervene because they had a substantial interest in the use and enjoyment of the park which was different than that of the Town, and this interest could be impacted by the proceeding. These intervenors are the appellants in this appeal.

¶ 6. In March 2016, the Town's selectboard held a public meeting and voted against ratification of the stipulation with VGS. Soon thereafter, VGS filed an amended petition of condemnation with the Board, acknowledging that the Town no longer stipulated to the condemnation. VGS and the Town engaged in further discussions, and on August 1, 2016, they signed a revised stipulation for condemnation of an easement to the west of, and roughly parallel to, the Vermont Electric Power Company (VELCO) electricity transmission easement that ran through the park. The stipulation included the agreed-upon compensation for the easement, terms of VGS's distribution of natural gas to customers in Hinesburg, and conditions that would restrict VGS's use of the easement. It provided that VGS would use horizontal directional drilling (HDD), meaning it would drill bores in the properties to the north and south of the park to install the

3

pipeline thirty to fifty feet underground throughout the length of the easement without disrupting the land within the park.[1] The stipulation provided that VGS would comply with plans to protect the golden-winged warbler habitat in the vicinity of the pipeline and to conserve the recreational uses and ecology of the park. The stipulation also included a proposed deed of easement that provided more details about VGS's rights and restrictions.

¶ 7. The Board conducted a site visit of the park on August 2, 2016, and held an evidentiary hearing two days later on August 4. VGS witnesses testified about the alternative routes VGS had analyzed and the impact of the easement on the park.[2] Intervenors did not present testimony or other evidence. In their post-hearing briefing, intervenors contended that: (1) the prior public use doctrine as articulated by this Court barred the condemnation because the park was already dedicated to a public use; (2) if the Board were to recognize an exception to the public use doctrine that allowed condemnation when the new use would not materially interfere with the prior use, the easement would materially interfere with the use of the park; and (3) the condemnation was not necessary as required by 30 V.S.A. § 112(a)(2) because VGS did not show that the alternative routes were infeasible, more costly, or would result in greater impacts to natural resources.

---

[1] A witness provided more details about HDD at the hearing. HDD allows the pipeline to be installed below ground without disturbing the surface of the park. It requires first drilling a bore below the surface of the property where the pipeline will lay, and then increasing the size of the bore until it is large enough for the pipeline. VGS planned for the entry and exit points of the bore to be to the north and south of the park, so it would not cause any drilling to occur within the park itself. Once the bore is large enough, the length of the pipeline is pulled through. The drilling process involves the use of drilling fluid that may escape into the ground or rise to the surface, which is called an inadvertent return and can be harmful to the environment. Although HDD does not require disrupting the surface of the park, VGS does need the rights to use a substantial area aboveground and adjacent to the route when installing it, because it needs a place to lay the pipe before pulling it into the bore.

[2] Intervenors made other arguments that the Board rejected and intervenors have not raised on appeal. We do not address these other arguments.

¶ 8. On September 13, 2016, the Board issued a written order authorizing VGS to condemn the easement in the park. First, the Board determined that VGS had satisfied the requirements of 30 V.S.A. § 112. It concluded that the condemnation was reasonably necessary pursuant to § 112(a)(2) so that VGS could provide adequate natural gas service in Addison and Chittenden counties.

¶ 9. With respect to the applicability of the prior public use doctrine, the Board recognized that this Court has not squarely addressed whether land dedicated to a public use may be condemned for another public use when the new use does not materially interfere with the prior use. It explained that other jurisdictions have recognized an exception to the doctrine which allows the condemnation of land when the new public use does not destroy or materially impair the prior public use. The Board concluded that the public use doctrine "is to be tempered in cases where the public good will best be served by requiring the joint use of a property that is already subject to a prior public use, provided the additional public use will not destroy or materially interfere with the prior public use." It went on to conclude that VGS's pipeline was a public use that would not interfere with the prior recreational use of the park.

¶ 10. In its necessity analysis, the Board considered the alternative routes that VGS analyzed, including a route that went through the VELCO transmission corridor within the park and three routes that went around the park. The routes that went around the park were labeled the eastern route, western route, and far western route. The Board determined that all four alternatives were inferior to the proposed route. None of the routes around the park followed a straight line as called for by industry best practices, and all would be significantly longer and would require more pipe. They would all encounter terrain challenges because of soil instability, elevation changes, tree clearing, rocky ledges, highways, or houses. The alternative route through the VELCO transmission corridor also presented problems due to wetlands in the area and a house to the south

5

of the park. The Board also noted that requiring VGS to pursue an alternative route would introduce the risk of further delay in completing construction of the pipeline.

¶ 11. The Board also determined that the condemnation would not unduly interfere with the orderly development of the area under § 112(a)(3). It concluded that the easement would not violate any community standards intended to promote the scenic preservation of the park because the pipeline itself would be completely underground and not visible to the public, and the pipeline markers and cathodic protection test access points the easement allowed VGS to install would not be intrusive to the park's aesthetics. The Board further concluded that, because VGS would not disturb the surface of land within the park, installation of the pipeline would not affect park uses.

¶ 12. The easement approved by the Board included the following terms. VGS must use HDD to install the pipeline under the surface of the park. During and after construction, VGS may not exclude members of the public from the easement area except when necessary on a temporary basis for public safety. VGS may not construct "above-ground appurtenances" in the easement, except for "mandatory and lawfully required safety and operational appurtenances," including pipeline markers and cathodic test leads, to be installed and maintained in consultation with the town. VGS may conduct regular route inspections on foot, and has the right within the easement area to inspect, maintain, repair, replace, reconstruct, and remove the pipeline. After installation it must use HDD "to the extent feasible" to repair, maintain, replace, reconstruct, or remove the pipeline. Except in exigent circumstances that pose a risk to public health or safety, VGS must provide reasonable notice to the Town when accessing the easement for maintenance and repair, and may only access the area where it meets the property boundaries on the north and south sides. VGS may cross other parts of the park to access the easement only in exigent circumstances. It must keep the easement area clear of debris during periods of construction, and it must remediate any damage it causes on park land in the event that the company disturbs the surface of the property during an emergency. The Town must consult with VGS and obtain written consent before

6

constructing any trails, unpaved roadways, or utilities structures, or constructing or storing any other objects within the easement area, and must construct such improvements as perpendicular to the easement area as is reasonably practicable.[3]

¶ 13.   After the Board denied their motions for a new trial and to alter or amend the judgment, intervenors appealed.[4]   On appeal, intervenors make three primary arguments.  First, they argue that the prior public use doctrine prohibits the Board from authorizing condemnations of land already devoted to a public use.  Second, they argue that, if we accept the Board's adoption of an exception to the public use doctrine that allows condemnation of land devoted to a public use if the new use does not materially impair the prior use, the easement in this case does materially impair the use of the park.  Third, they contend that the Board erred in concluding that the condemnation was necessary because VGS did not adequately evaluate alternate routes for the pipeline.  For the reasons set forth below, we reject intervenors' arguments and affirm the Board's

---

[3]   The Board's order recognized the town's purported right "to continue to use and enjoy the Easement Area in a manner that is consistent with educational, recreational, and municipal uses," and stated that the town's uses "may include, but shall not be limited to, using the Easement Area for educational, recreational, agricultural, open space, setback, density, trails, unpaved roadways, and utility purposes" subject to the limitations articulated by the Board.  This description of the town's uses of the park appears to be more expansive than the covenant requiring that the land be used "only as a public park or school or for public recreational or educational purposes."  On remand, the Board's order, and the accompanying easement of record, should be amended to reflect that the town shall have the right to continue to use and enjoy the Easement Area for all purposes authorized pursuant to the restrictive covenant attached to the land, subject to the specified limitations in the Board's order and deed.

[4]   The notice of appeal triggered an automatic stay under 30 V.S.A. § 124.  In considering VGS's request to vacate the stay, we concluded that intervenors had not demonstrated a strong likelihood of success, although we emphasized that "this conclusion does not have any impact on our later consideration of the merits of the underlying appeal."  In re Vt. Gas Systems, Inc. 2016 VT 132, ¶ 4, __ Vt. __, 161 A.3d 522.  We concluded that VGS, but not appellants, demonstrated a threat of irreparable injury.  VGS had secured a $1,000,000 bond to indemnify the town for any harm to the park, and we were persuaded by VGS's assertion that if intervenors prevailed, VGS could return the park to its pre-drill condition.  Id. ¶ 5.  Considering these factors, and noting the significant economic benefits of the pipeline to the state, we granted VGS's motion to vacate the stay.  Id.

7

decision to authorize the condemnation. We remand for resolution of minor issues relating to the terms of the easement.

¶ 14. We typically apply a deferential standard of review to appeals from the Board and "[o]rders issued by the Board enjoy a strong presumption of validity." In re Green Mountain Power Corp., 162 Vt. 379, 380, 648 A.2d 374, 376 (1994). We will uphold a Board decision when its findings are supported by the record and its conclusion is supported by its findings. In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 35, 185 Vt. 296, 969 A.2d 144. However, we do not defer to Board decisions on questions that are not within its particular areas of expertise, such as legal questions that do not turn on considerations specific to the Board's sphere of regulation. See In re Tariff Finding of Cent. Vt. Pub. Serv. Corp., 172 Vt. 14, 19-20, 769 A.2d 668, 673 (2001) (reviewing questions of claim and issue preclusion without deference because they are outside Board's special expertise). Accordingly, our review of the legal question concerning the scope of the prior public use doctrine is plenary and nondeferential, and our review of the Board's findings related to material impairment and necessity is deferential.

## I. Prior Public Use

¶ 15. In a decision of first impression, we conclude that the prior public use doctrine does not prohibit condemnation of land devoted to a public use when the new use does not materially impair the prior use. Applying this legal framework to this case, we conclude that the Board's conclusion that the easement will not materially impair use of the park is supported by the record. We consider each step of the analysis in turn.

## A. "Material Impairment" of Prior Public Use

¶ 16. The prior public use doctrine provides that property already appropriated for a public use may not be condemned for another public use in the absence of express or implied legislative authority. See Vt. Hydro-Elec. Corp. v. Dunn, 95 Vt. 144, 149, 112 A. 223, 225 (1921); Rutland-Canadian R.R. v. Cent. Vt. Ry. Co., 72 Vt. 128, 133, 47 A. 399, 400 (1900). Our case

8

law does not address whether this doctrine precludes <u>any</u> condemnation of property subject to a prior public use, or only a condemnation that materially impairs the existing use. But a bright line rule that would prohibit condemnation for a public use that does not materially impair an existing public use would not advance the purpose of the prior public use doctrine and would undermine the goals of the condemnation statute. The weight of persuasive authority from other states reinforces this conclusion, and we are not persuaded by intervenors' arguments that only the Legislature can adopt this refinement of the prior public use doctrine and that our holding will confer on the Board authority to make determinations that it is not qualified to make. For these reasons, we conclude that VGS is not barred from condemning the easement at issue in this case if the easement will not materially impair the existing public use.

¶ 17.    This is an issue of first impression in Vermont. We have never actually considered whether condemnation for a use that does not materially impair a prior public use is permissible because our cases have all involved second uses that would destroy or materially impair the prior uses. For example, in <u>Vermont Hydro-Electric Corporation v. Dunn</u>, a town sought to condemn water rights in a river for the purpose of diverting the river and creating a new water source for the town. 95 Vt. at 144, 112 A. at 223. A public service corporation owned the water rights and intended to construct a hydroelectric plant on the river. This Court determined that "the proposed taking would wholly destroy" the prior public use, that the Legislature had not granted the town authority to condemn the water rights in that particular river, and that the prior public use doctrine applied to prohibit the condemnation. <u>Id</u>. at 149, 112 A. at 226-27; see also <u>President & Fellows of Middlebury Coll. v. Cent. Power Corp. of Vt.</u>, 101 Vt. 325, 336, 143 A. 384, 389 (1928) (concluding power company could not condemn park land consisting of "virgin and primeval forest" to develop electrical power project); <u>Rutland-Canadian R.R.</u>, 72 Vt. 128 at 133, 47 A. at 401 (concluding railroad company could not condemn part of another railroad company's land when condemnation would "cut said [land] in two by an independent line, of which the petitioner

9

would be seised and have the exclusive possession and control"); Rutland Ry., Light & Power Co. v. Clarendon Power Co., 86 Vt. 45, 56-57, 83 A. 332, 337 (1912) (concluding that electric power company could not condemn another utility's hydroelectric site, thereby taking over all uses of the site).

¶ 18. Our past articulation of the doctrine likewise offers no consistent guidance. More often than not, we have described the prior public use doctrine using broad language, without any qualification that the condemnation is only prohibited if it would materially impair the existing use. See, e.g., President & Fellows of Middlebury Coll., 101 Vt. at 336, 143 A. at 388 ("[I]t is the well-settled law of this state that property already appropriated to a public use cannot be taken for another public use without legislative authority, either express or implied."). But we have occasionally referenced the interference caused by a proposed second use in describing the doctrine. For example, in Rutland-Canadian Railroad, we stated that general eminent domain authority "is not sufficient to authorize the taking for an inconsistent purpose of property already devoted to a public use." 72 at 133, 47 A. at 400 (emphasis added); see also Vt. Cent. R.R. v. Royalton, 58 Vt. 234, 238, 4 A. 868, 871 (1886) ("It is settled law that property already taken and held for public use by a corporation cannot be interfered with by another corporation, for other public use, without legislative authority to that end." (emphasis added)). For these reasons, our case law does not resolve the question.

¶ 19. Applying the public use doctrine to situations in which the proposed use does not materially impair the prior use does not further the purpose of the doctrine. The purpose of the doctrine is to protect public uses and to prevent land from being condemned back and forth between competing condemners, which would result in a lack of consistent public use of the land. Cemetery Co. v. Warren Sch. Twp. of Marion Cty., 139 N.E.2d 538, 544-45 (Ind. 1957); Ga. Dep't of Transp. v. Jasper Cty., 586 S.E.2d 853, 855 (S.C. 2003). Furthermore, the doctrine ensures that a legislature, and not a court or administrative agency, is making policy decisions about the relative

10

importance of competing public uses. Cemetery Co., 139 N.E.2d at 545. Applying the doctrine when the proposed use of the land does not materially interfere with the prior use does not further these purposes. When the prior and new public uses may coexist without material impairment to the former, the risk of back-and-forth condemnation proceedings is diminished, and there is no need for policy judgments about which use is more valuable.

¶ 20. In addition, limiting the scope of the doctrine to cases in which the proposed second public use materially impairs the first furthers the goals underlying the condemnation statute. The prior public use doctrine is not itself a product of legislation; it reflects a long-established judicial gloss on condemnation statutes. To some extent, its application operates in derogation of the goals of the condemnation statute. For example, in this case the Legislature has provided that upon finding that condemnation of property is necessary to enable a utility to render adequate service to the public, and upon finding that the condemnation will not unduly interfere with the orderly development of the region, "the Board shall adjudge the petitioner entitled to condemn such property or right." 30 V.S.A. § 112 (a)(4) (emphasis added). By definition, the condemnation power here is limited to cases in which the condemnation is necessary to enable Vermont Gas to provide adequate service to the public. A limit on the exercise of that authority in recognition of a preexisting public use undermines this legislative goal; applying the limitation where the second use does not materially impair the first use would constrain the condemnation authority granted by the Legislature with no supporting rationale. Burlington Elec. Dep't v. Vt. Dep't of Taxes, 154 Vt. 332, 335, 576 A.2d 450, 452 (1990) ("When construing a statute, our primary objective is to effectuate the intent of the Legislature.").

¶ 21. For similar reasons, the majority of other jurisdictions that have considered this question have concluded that the prior public use doctrine does not bar condemnation for a use that does not materially impair the prior public use. See, e.g., Ga. S. & F. Ry. Co. v. State Rd. Dep't, 176 So. 2d 111, 112 (Fla. Dist. Ct. App. 1965); Greater Clark Cty. Sch. Corp. v. Pub. Serv.

11

Co., Ind., Inc., 385 N.E.2d 952, 954 (Ind. Ct. App. 1979); Mahajan v. Dep't of Envtl. Prot., 984 N.E.2d 821, 831 (Mass. 2013); Town of Fayal v. City of Eveleth, 587 N.W.2d 524, 529 (Minn. Ct. App. 1999); City of Las Cruces v. El Paso Elec. Co., 1998-NMSC-006, ¶ 6, 954 P.2d 72; Bergen Swamp Pres. Soc'y v. Vill. of Bergen, 741 N.Y.S.2d 363, 365 (App. Div. 2002); City of Worthington v. City of Columbus, 2003-Ohio-5099, ¶ 22, 796 N.E.2d 920; Pub. Util. Dist. No. 1 of Okanogan Cty. v. State, 342 P.3d 308, 317 (Wash. 2015) (en banc).

¶ 22.   For several reasons, we are not persuaded that our analysis takes us beyond the scope of our judicial role.  Intervenors contend that the Legislature passed 30 V.S.A. § 110, the statute granting public service companies the power to condemn property, after this Court established the public use doctrine.  Therefore, because we must consider the common law that was in effect when the Legislature passed the statute, State v. Oliver, 151 Vt. 626, 627, 563 A.2d 1002, 1003 (1989), intervenors argue that § 110 effectively codified this Court's early articulation of the doctrine, which did not contain the material-impairment limitation that the Board applied. Intervenors contend that only the Legislature may now limit the scope of the doctrine to cases in which the second use materially impairs the first.

¶ 23.   We disagree.  First, nothing in § 110 indicates an intent to codify or limit the prior public use doctrine; that statute simply grants public utilities a general condemnation power. Second, as noted above, this is a case of first impression.  Prior to this decision, our cases did not purport to resolve the scope of the prior public use doctrine in relation to the materiality of the impairment caused by the second proposed use.  To the extent that we are to consider the law in effect when the Legislature enacted § 110, that law does not resolve this question.  Third, the prior public use doctrine itself reflects a judicial gloss on condemnation statutes.  Intervenors' reliance on the court's authority to adopt such a principle in the first place, while they simultaneously argue that this Court is powerless to refine the doctrine as new questions concerning its application arise, is incongruous.

¶ 24. We also disagree with intervenors' argument that adopting this limitation grants the Board power that it is not qualified to exercise. When considering a condemnation request with respect to property already dedicated to public use, the Board is not, as intervenors suggest, faced with making a value judgment between two public uses; its analysis is restricted to the impact of the proposed use on the prior use. If the Board determines that the proposed use materially impairs the prior public use, it must disallow the condemnation and is not called upon to make a policy judgment about the value of competing public uses. See Cemetery Co., 139 N.E.2d at 545 ("To us the determination of the relative values and importance of different public uses, one of which will be inconsistent with or destroy another, is purely a legislative matter . . . . "). This kind of determination about "impairment" falls squarely within the Board's area of expertise. Before issuing a CPG for a natural gas pipeline or authorizing condemnation for the same purpose, the Board must determine that the project "will not unduly interfere with the orderly development of the region and scenic preservation." See 30 V.S.A. § 112(a)(3); see also 30 V.S.A. § 248(b). Considering whether a prior public use is materially impaired is similar to, if not exactly the same as, what the Board does already, and we have no concerns about its qualifications to do so. Plus, as with all other Board decisions, its determination regarding material impairment may be appealed and is therefore subject to this Court's review. 30 V.S.A. § 124.

¶ 25. For these reasons, we hold that the prior public use doctrine does not preclude condemnation of land already dedicated to a public use when the proposed use will not materially impair the prior use.

B. Application of Material Impairment Standard to this Case

¶ 26. We conclude that the Board's determination that the easement will not materially impair the prior use of the park was supported by the record. In reaching this conclusion, we acknowledge that the property's status as a park is relevant to the analysis, but reject intervenors' suggestion that the fact that the property is a public park is dispositive in this case. Considering

13

the applicable standards and the impact of the installation of the pipeline, the ongoing maintenance, and the restrictions on the town's use of the easement area, we conclude that the Board's conclusion that the easement will not materially impair the existing recreational use of the property was supported by substantial evidence.

¶ 27. We reject intervenors' arguments that VGS cannot condemn the park because the land must be awarded special protection as a public park. In making the "material impairment" determination, the condemning authority must necessarily consider the use and character of the land prior to condemnation; the fact that the property is used as a park factors into that assessment. But the cases intervenors cite to support the argument that public parks may not be condemned for easements absent express legislative authority are not persuasive. Intervenors cite Minnesota Power & Light Co. v. State, 225 N.W. 164 (Minn. 1929), for the proposition that parks may not be condemned without express legislative approval. The court in that case did state that it would not imply the authority to condemn public parks, but went on to explain that the public use doctrine does not apply when the proposed use does not materially interfere with the prior use. Id. at 166. The court ultimately concluded that the new use would materially interfere with the use of the park. Id. That case supports the proposition that even if the prior use is a park, the condemning authority must assess whether the proposed condemnation materially impairs that use. The Massachusetts Supreme Judicial Court's decision in Town of Brookline v. Metropolitan District Commission, 258 N.E.2d 284 (Mass. 1970), is also distinguishable because it relies in part on a Massachusetts statute expressly stating that park land could not be taken to be used as a road.[5]

---

[5] We are not swayed by intervenors' argument that, when land is held in trust, violation of the trust terms amounts to a material impairment. They cite one case in support of this argument, City of Wilmington v. Lord, 332 A.2d 407 (Del. Super. Ct. 1975). The court in that case assumed, without explaining, that a violation of the trust terms was the equivalent to a material impairment of the prior public use, and, because a prior court had determined that the proposed use violated the trust terms, the public use doctrine prohibited the condemnation. Id. at 409. Significantly, the court expressly distinguished the scenario in which the City held a property pursuant to the terms of a trust from that in which it acquired the property pursuant to a deed with restrictive covenants, and limited its holding to the former. In this case, the town acquired Geprags Park pursuant to a

14

¶ 28.    Two precepts guide our review of the Board's assessment that the easement will not materially impair the existing use of the park.  First, in considering the impact of an easement, condemning authorities "must look to the entire use of the affected property, and not a portion of its use."  Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth., 258 S.W.3d 613, 617 (Tex. 2008).  Second, they consider whether the prior use is "materially" impaired, meaning that the land may be condemned if the easement results only in immaterial impairment.  See, e.g., Ga. S. & Fla. Ry. Co., 176 So. 2d at 113 (authorizing condemnation of property used for public purpose even when proposed use would interfere with railway's ability to maintain railroad tracks); Lake Cty. Parks & Recreation Bd. v. Ind.-Am. Water Co., 812 N.E.2d 1118, 1124 (Ind. Ct. App. 2004) (authorizing condemnation when easement would result in temporary impairment of prior public use).

¶ 29.    In this case, the installation of the pipeline and its ongoing presence will have a negligible effect on the existing use of the park.  The park covers eighty-five and a half acres and is home to a barn, sledding hill, and a series of walking trails.  It already contains an easement used for power lines that is one hundred and fifty feet wide and runs from north to south in the western part of the park.  The park primarily consists of a forested area to the east of the powerlines, which is where most of the walking trails are located.  One trail crosses over to the west side of the park. The pipeline easement is fifty feet wide, covers a surface area of under two and a half acres, is located to the west of the VELCO easement, and only intersects the one trail that lays on the western side of the park.  VGS will use HDD to install the pipeline from points beyond the northern and southern boundaries of Geprags park, meaning that it does not have to disturb the surface of land within the park.  The pipeline itself will be entirely underground.  Based on this evidence, the

---

deed with covenants.  Even if we were inclined to consider adopting a per se rule that violation of the terms of a trust amounts to a material impairment, the rule would not change the outcome in this case.

15

Board could conclude that the initial installation and the actual pipeline will have no material impact on park uses.

¶ 30. Likewise, VGS's ongoing rights of access to the park will have minimal impact on the park's recreational uses. The easement requires that VGS use HDD to the extent feasible to repair, maintain, replace, reconstruct, or remove the pipeline, but contemplates that in the event of an emergency or infeasibility, VGS may use more intrusive methods. VGS presented evidence that the likelihood that it would take advantage of this right is low and that it may inspect the pipeline without disturbing the surface by running a tool through the pipe that can detect problems. VGS may temporarily exclude members of the public from the easement area when necessary, and it may construct pipeline markers and cathodic test leads aboveground within the easement area. It may also conduct inspections of the pipeline route by foot. It typically must access the easement only from where the easement meets the property boundaries on the north and south sides, but may cross other parts of the park to access the easement in exigent circumstances.

¶ 31. These rights and restrictions do not materially impair the prior park uses. The possibility (but not likelihood) that VGS might temporarily impair park uses by using methods other than HDD to maintain the pipeline, and its ability to access the easement area for inspections and temporarily exclude the public from the easement area, do not undermine the Board's conclusion. The fleeting nature of most of these intrusions, and the remoteness of the likelihood of the more substantial intrusion of digging or trenching to reach the pipe from within the easement, limit their materiality. See Lake Cty. Parks & Recreation Bd., 812 N.E.2d at 1124 (concluding that condemnation was allowed because any disruption of walking path to install and maintain underground water main by trenching would only be temporary). The placement of pipeline markers and test leads similarly does not constitute material impairment, considering that these installations are inconspicuous, as they are approximately three to four feet tall and have a

16

diameter of three inches, and would only be placed within the easement area. The rights granted to VGS therefore do not materially impair the park's uses or purposes.

¶ 32. Assuming that the easement restrictions on the town's use of the easement area are necessary pursuant to 30 V.S.A. § 112(a)(2), these restrictions also do not materially impair park uses. The town may not construct trails, unpaved roadways, utilities, or any other structures, or store objects within the easement area without VGS's prior written consent. The park does not contain many manmade structures and there was no evidence suggesting that the town had plans to erect such structures anywhere within the park, much less within the easement area, nor that the town planned to construct new trails or roads that would intersect with the easement. Cf. City of New Haven v. Town of East Haven, 402 A.2d 345, 351 (Conn. Super. Ct. 1977) (enjoining town from condemning three parcels of land because proposed public use would destroy existing public use, which was reserving the parcels for future airport expansion). The restriction is not a total ban on what the town may build on the easement; it only requires the town to obtain VGS's consent, which it may withhold only "in its reasonable discretion." See Lake Cty. Parks & Recreation Bd., 812 N.E.2d at 1124 (affirming authorization of condemnation when easement required owner of property to obtain condemner's consent before using the land in any way "inconsistent with" the condemner's use of easement). Furthermore, this restriction again impacts only a small portion of the park—less than two and a half acres out of eighty-five—which means that the vast majority of the park is not impacted by it. See, e.g., Canyon Reg'l Water Auth., 258 S.W.3d at 617 (allowing condemnation when proposed use would completely destroy prior use of only a small portion of property). Lastly, the restrictions on the town's use of the easement area do not impair the uses provided for in the deed to the town, as the property may still be used "as a public park or school or for recreational or educational purposes."[6]

---

[6] We reject the dissent's suggestion that the easement materially impairs the public use due to the deed language restricting use of the park to only recreational or educational purposes. The restrictive convenant in the deed constrains the town in its use of the property, but is not itself

17

¶ 33.   The record evidence concerning the nature and use of the whole park and the conditions and location of the easement support the Board's conclusion that any adverse impacts upon the park that may result from the easement do not amount to material impairment.

## II.  The Board's Determination of Necessity

¶ 34.   We affirm the Board's findings and conclusions regarding necessity.  Intervenors argue that VGS did not conduct a sufficiently rigorous analysis of alternate routes, and that the Board erred in determining that a condemnation of the particular route in question is necessary.  In upholding the trial court's analysis, we conclude that the applicable standard is not as stringent as intervenors urge, reject intervenor's contention that VGS presented insufficient evidence that the chosen route was superior to alternatives, and conclude that the Board did not improperly rely on an artificial deadline or desire to avoid the costs of delay in making its necessity determination.

¶ 35.   In this case, our focus in the necessity analysis is on the necessity of the particular easement route chosen by VGS and approved by the Board.  Pursuant to 30 V.S.A. § 112(a)(2), the Board must, before authorizing the condemnation of property, determine that the condemnation "is necessary in order that the petitioner may render adequate service to the public."  Although the CPG process occurs prior to condemnation, we have explained that the CPG proceeding involves "no predetermination of the issue of necessity of condemnation for any particular route."  Auclair v. Vt. Elec. Power Co., 133 Vt. 22, 27, 329 A.2d 641, 645 (1974).  At issue in this proceeding is whether the project must involve "this particular piece of property."  Vt. Elec. Power Co. v. Bandel, 135 Vt. 141, 148, 375 A.2d 975, 980 (1977) (explaining that necessity analysis requires considering why project must "involve this particular property").  The fact that VGS obtained a CPG that authorized a route through the park does not, therefore, control the question of necessity

---

a barrier to exercise of the State's condemnation authority.  The potential constraint on the State's condemnation power in this case arises from the public use to which the property is dedicated—educational and recreational use.  Insofar as the proposed use at issue in this case is compatible with that use, Dora Geprags' desire as devisor to exclude other uses is not a bar to exercise of the State's condemnation authority.

in the condemnation proceeding. The question in the condemnation proceeding is whether this easement is reasonably necessary.

¶ 36. To satisfy this necessity requirement, the petitioner must show that the condemnation "is reasonably necessary to accomplish the end in view after weighing all the circumstances which bear on any given situation." Vt. Elec. Power Co,, 135 Vt. at 149-50, 375 A.2d at 981. Appellants advocate a more stringent standard of necessity than is supported by the law; the standard is not whether another route is feasible, but whether the proposed route is reasonably necessary in light of all relevant circumstances, including any alternatives. See In re Cent. Vt. Pub. Serv. Corp., 2010 VT 7, ¶ 3, 187 Vt. 598, 992 A.2d 308 (mem.) (affirming Board's determination of necessity when Board considered alternatives and determined that proposed route was superior based on multiple factors). As a practical matter, the absence of feasible alternatives could not be a requirement, because that would mean that if there is more than one feasible route, then condemnation of any one of them would never be necessary.

¶ 37. In this case, VGS presented sufficient evidence that the chosen route for the pipeline through the park was the best option. VGS proposed four alternative routes, and its testimony established that all four were inferior to the proposed easement for multiple reasons. The three routes around the park would all be longer than the easement through the park, would be less linear and thus less compliant with industry best practices because they would require VGS to construct sharp turns in the pipeline, and would implicate additional parcels of land that VGS would have to acquire the rights to use. Using an alternative route would also result in significant cost increases and delays in construction because of the need to acquire more easements. The eastern route would necessitate blasting through rocky ledge, implicate a highway and cause traffic management problems, and involve hilly terrain. The western route would require VGS to cut mature forest on a steep rocky slope, causing adverse effects on natural resources and aesthetics, and would require blasting of rocky ledge. The far western route presented problems due to

19

changes in elevation. Additionally, the route through the VELCO corridor presented problems with wetlands within and to the north of the park; could impact the surface of the park during installation because VGS would have to excavate at the points where the pipeline turned; and faced obstacles because a house located to the south of the park would create difficulties when installing the pipeline using HDD due to the large amount of space needed to stage the equipment. This testimony supports the Board's findings concerning the disadvantages of each of the alternative routes explored by VGS and its conclusion that VGS had established that condemnation of the easement through Geprags Park was reasonably necessary.

¶ 38. VGS's failure to provide cost estimates for the alternate routes does not undermine our conclusion on this point. Appellants argue that VGS failed to prove necessity because it did not prove that installation of the pipeline through the easement would cost less than the alternatives. Given the Board's findings about the practical disadvantages of each of the alternative routes explored, the absence of comparative cost data does not undermine the Board's conclusions. Cost is one of many factors that may be considered in the necessity analysis. See In re Cent. Vt. Pub. Serv. Corp., 2010 VT 7, ¶ 3 ("Furthermore, cost is not an unreasonable factor in selecting among alternative approaches where it is one of several elements of the analysis."). In this case, the Board received testimony about numerous practical and environmental problems with each of the alternative routes. Intervenors did not present any evidence that an alternative route would be superior to the easement ordered by the Board. On this record, the Board concluded that the four alternative routes were inferior options, and that the easement through the park was the shortest and most direct way to connect the northern and southern ends of the pipeline route. Its conclusion is supported by the evidence and its findings, and the absence of comparative cost data does not undermine the Board's determination in this case.

¶ 39. The Board's consideration of the risk of further delay in the project was not error on this record. Intervenors suggest that the Board improperly relied on VGS's self-imposed

20

deadline for placing the project into service, or its desire to avoid the costs of delay. Intervenors argue that VGS was itself responsible for any potential delay because it failed to timely and sufficiently explore alternative routes. Intervenors overread the Board's decision on that issue. The Board did acknowledge that its judgment was "informed by recognizing that requiring VGS to pursue an alternative to the easement would introduce the risk of further delay in completing construction of the pipeline" to the detriment of Vermonters waiting for natural gas service. But, independent of that factor, the Board had already concluded that the four alternatives were inferior based on terrain challenges due to soil instability and elevation changes, required tree clearing that would be visible from the park, the need for ledge blasting near a state highway and residences, the need to use more pipe, and the desirability of straight pipe without multiple bends. Although the Board may have been mindful of the costs of delay, we do not read its analysis as relying to any great degree on that factor.

The Board's order is affirmed except that the matter is remanded for the Board to revise its order as set forth in footnote 3.

FOR THE COURT:

_____
Associate Justice

¶ 40. **EATON, J., dissenting.** I agree with the majority that the prior public use doctrine should not be applied to preclude condemnation of lands pursuant to a general condemnation statute in situations where the proposed use would not materially impair the prior use. As the majority reasons, doing so would undermine the goals of the condemnation statutes while doing nothing to further the purpose of the doctrine. I believe, however, that our adoption of a "compatible use" exception to the doctrine is contrary to our prior caselaw and that we should overrule that caselaw to the extent it is inconsistent with our holding today.

21

¶ 41.    I also agree with the majority that the nature of the prior use—in this case a park dedicated for recreational or educational purposes—is not necessarily controlling but is a factor in determining whether the proposed use would materially impair the prior use. I would conclude, however, that granting an easement for a pressurized gas pipeline through a park dedicated to recreational or educational uses only, and giving the condemnor the discretion to restrict the Town's use of the land over which the easement runs, materially impairs the prior use such as to require specific legislative authorization for the condemnation.

¶ 42.    In short, in my view, the terms of the easement as set forth by the Public Service Board would materially impair park land dedicated exclusively for recreational or educational purposes. Accordingly, I respectfully dissent.

¶ 43.    My first departure from the majority opinion is on a relatively minor point. In my view, our prior caselaw concerning the prior public use doctrine adopted a general rule, without recognizing any exception, "that property already taken for a public use cannot be taken for another public use without legislative authority expressly given or necessarily implied." Rutland-Canadian R.R. v. Cent. Vt. Ry. Co., 72 Vt. 128, 133, 47 A. 399, 400 (1900); see Vt. Gas Sys., Inc. v. City of Burlington, 130 Vt. 75, 77, 286 A.2d 275, 276 (1971) (stating that plaintiff utility "could not, by its [general] powers of eminent domain, acquire a property interest" that had "already [been] dedicated to a public use" absent specific "legislative authorization"); President & Fellows of Middlebury Coll. v. Cent. Power Corp. of Vt., 101 Vt. 325, 336, 143 A. 384, 388 (1928) ("[I]t is well-settled law of this state that property already appropriated to a public use cannot be taken for another public use without legislative authority, either express or implied."); Vt. Hydro-Elec. Corp. v. Dunn, 95 Vt. 144, 149, 112 A. 223, 225 (1921) ("It is the settled law of this state that property already legally appropriated to a public use cannot be taken for another public use without legislative authority expressly given or necessarily implied.").

¶ 44. To be sure, as the majority points out, on a couple of occasions our decisions have contained language suggesting that some incompatibility between the prior and proposed public uses might be an element of the doctrine. See Rutland-Canadian R.R., 72 Vt. at 133, 47 A. at 400 ("Authority given in general terms . . . is not sufficient to authorize the taking for an inconsistent purpose of property already devoted to a public use, and necessary for the purpose to which it is devoted." (emphasis added)); Vt. Cent. R.R. v. Royalton, 58 Vt. 234, 238, 2 A. 868, 871 (1886) ("It is settled law that property already taken and held for public use by a corporation cannot be interfered with by another corporation, for other public use, without legislative authority to that end." (emphasis added)). But our vague and unexplained insertion of such language in those two cases is not the equivalent of adopting a compatible use exception to the doctrine in situations where the proposed use does not materially impair the prior use. See Minn. Power & Light Co. v. State, 225 N.W. 164, 166 (Minn. 1929) (stating that prior public use doctrine generally does not apply "where the second use does not materially or seriously interfere with the first use, or, where the second use is not inconsistent and the two uses may be enjoyed together without serious injury to or interference with the first use" (emphasis added)). Our mostly ancient caselaw on this subject essentially laid out a broad rule without exception. Rather than call this a case of first impression, we should overrule that caselaw to the extent it is inconsistent with our adoption today of a compatible use exception that precludes application of the doctrine when the proposed use will not materially impair the prior use.

¶ 45. Applying the exception to this case, I would rule that the proposed use materially impairs the prior use. Consider the nature of the use. A private citizen, Dora Geprags, devised her property to the Town of Hinesburg subject to a restrictive covenant running with the land in perpetuity stating "that the property decreed hereby shall be used only as a public park or school for recreational or educational purposes, and the Town of Hinesburg shall properly maintain and care for the property decreed hereby." (Emphasis added.) Cf. City of Wilmington v. Lord, 332

23

A.2d 407, 409 (Del. Super. Ct. 1975) (distinguishing case relied upon by condemnor by noting that, in determining that proposed use would not destroy or injure prior use of property held in trust, court relied upon fact that covenant in deed required property to be used " 'for the purpose of a park' rather than 'for the purpose of a park only' "). Recognizing that it lacked the authority to grant Vermont Gas Systems, Inc. (VGS) easement rights that would violate the devise's restrictive covenant, the Town initially agreed not to oppose VGS's condemnation of a pipeline easement through the park, and eventually agreed in a revised stipulation to VGS's condemnation of the easement based in part on VGS paying the Town $250,000. In short, after accepting Ms. Geprags's gift subject to its restrictive covenant, the Town then accepted a quarter of a million dollars in return for agreeing to VGS's condemnation of part of the property in a manner that violated the restrictive covenant.

¶ 46.    Considering the prior public use of the subject property, there is little doubt that the proposed use will materially impair that prior use. See Material, Black's Law Dictionary (10th ed. 2014) (having "such a nature that knowledge of the item would affect a person's decision-making"); id. Impair ("diminish[ing] the value of"). As evidenced by the exclusionary language of the Board-approved easement, the installation and maintenance of a gas pipeline is entirely dissimilar to and inconsistent with the current use of the property as a park, and most particularly to its dedicated use for recreational or educational purposes only. Were the two uses not so incompatible, the language in the VGS easement restricting the Town's use of the park would not have been necessary. Importantly, the impact of the proposed use must be considered based on the terms of the easement established by the Board. See Farrell v. Vt. Elec. Power Co., 2012 VT 96, ¶ 11, 193 Vt. 307, 68 A.3d 1111 ("[T]he terms of a condemnation easement described in the order granting the easement define the easement holder's authority to use the condemned property.").

¶ 47.    Under the terms set forth by the Board, VGS has significant discretion in using the fifty-foot wide, 2000-foot long easement dissecting the park and overlaying the pressurized gas pipeline.    Among other things, pursuant to the Board's order, the Town "shall not prevent, or interfere with, [VGS's] use of the Easement Area" unless otherwise allowed by the order, and specifically "shall not unreasonably interfere with [VGS's] pipeline within the Easement area" through the "installation and use of trails, unpaved roadways, and utilities."    Additionally, the Town "shall consult with [VGS] and obtain written consent before beginning any construction on any trails, unpaved roadways, and utilities within the Easement Area, which consent [VGS] shall not unreasonably withhold, condition, or delay."    Furthermore,

> The Town shall not construct, install, or permit the construction or installation of any structures or objects of any kind upon or under the surface of the Easement Area, shall not store or place any objects within the Easement area, and shall not change the elevation of the Easement Area without [VGS's] prior written agreement or approval, which [VGS] may withhold or condition in its reasonable discretion.

Regarding VGS's installation and maintenance of the pipeline, VGS is required to use the nonintrusive Horizontal Directional Drilling (HDD) method to repair, replace, reconstruct, or remove the pipeline, but only "to the extent feasible."

¶ 48.    Given the scope of the easement as set forth by the Board, the proposed use will most certainly impair the prior use.  Cf. Town of Brookline v. Metro. Dist. Comm'n, 258 N.E.2d 284, 286 (Mass. 1970) (in denying general condemnation of parkland, noting common-law inviolability of parks and legislature's declared policy "to preserve parks free from intrusion of every kind which would interfere in any degree with their complete use for this public end"); Minn. Power & Light Co., 225 N.W. at 167 ("It seems reasonably clear that the [power] line [involving removal of foliage and erection of four or five towers] is inconsistent with the purpose of maintaining the land as a park, and that it will materially interfere with the use of the park, especially so in view of the careful provisions made by the Legislature for preserving the park land

25

from injury or interference."). The impact of the proposed use on the prior use is material due in part to VGS's discretionary authority over use of the land within the easement, particularly its discretion to preclude the Town from using the land as intended. It is also material in the sense that, had it been anticipated, it may well have precluded creation of the prior use in the first place, given the donor's express condition that the property be used exclusively for recreational or educational purposes. Indeed, I fear that our decision today could potentially cause testators to think twice about donating lands for public use knowing that their desires regarding restrictions on the use can be so easily ignored through general condemnation proceedings. Cf. President & Fellows of Middlebury Coll., 101 Vt. at 332, 336, 143 A. at 387, 389 (stating that devise of mountain forest land to be preserved "in its virgin and primeval state" for benefit of public cannot be taken in general condemnation proceedings).

¶ 49.    The terms of the easement foreclose use of the subject property exclusively for recreational and educational purposes, including any future construction of typical recreational and educational uses such as bleachers, rinks, restrooms, or school buildings within the easement area. The majority notes the relatively small size of the easement area compared to the overall size of the subject property and the fact that the Town has no existing plans to erect structures within the park or to construct new trails or roads that would intersect with the easement. The majority supports the latter point by citing a case that stands for an entirely different point: in situations where land is held with an expectation of future public use, that future public use must be "reasonably foreseeable" and not "a mere naked possibility." City of New Haven v. Town of E. Haven, 402 A.2d 345, 351 (Conn. Super. Ct. 1977).

¶ 50.    This is the same issue addressed in Dunn, where this Court held that "it is not necessary that the property be actually in use for the public purpose to exempt it from the [condemnation] proceeding." 95 Vt. at 149, 112 A. at 226. We emphasized in Dunn that, notwithstanding a "liberal consideration" of future and existing needs, "property held for future

26

use" will not be exempt from condemnation based upon "the mere possibility" of future public use but rather a "[r]easonable expectation of future needs is required to protect the property from condemnation." Id.; see 1A J. Sackman, Nichols on Eminent Domain § 2.17[5], at 98-99 (3rd ed. 2007) (citing Dunn, among other cases, for principle that "bare possibility of future use is insufficient to remove property from the operation of the power to condemn"). Thus, the general rule is that property devoted to a public use is exempt from condemnation for a different public use absent specific legislative authorization with respect to land "in immediate and necessary" public use "or" land acquired for a public purpose but "held in reasonable anticipation of its future needs, with a bona fide intention of using it for such purpose within a reasonable time." Dunn, 95 Vt. at 149-50, 112 A. at 226.

¶ 51.    In this case, the subject property is not being held in anticipation of future public use; rather, it is currently in public use as a park pursuant to a devise restricting its use in perpetuity solely for recreational or educational purposes. VGS's fifty-foot wide, 2000-foot long easement for a gas pipeline through the property not only immediately impacts the property's current use as a park but also materially interferes with its potential future use within the easement corridor for recreational or educational purposes, for which the property was exclusively dedicated.

¶ 52.    The majority also reasons that the subject property already has an easement for power lines on it in a different location and that the likelihood of using intrusive methods for maintaining or repairing the underground pipeline are remote. Regarding the first point, the other easement was already on the property when it was devised to the Town for a public purpose; thus, to the extent the existence of the prior easement is relevant to the question presented here, it indicates even a greater likelihood that placing another easement in a different location on the property would materially impair the public use. Cf. Minn. Power & Light Co., 225 N.W. at 351 (reasoning that allowing easement for power line through park would materially interfere with existing public use because park already had other utility and transportation lines running through

it and adding further servitudes "might well lead to its final extinction as a public park"). The preexisting power line easement is a factor supporting a material interference being created by virtue of the VGS easement, not a factor supporting its absence as the majority contends.

¶ 53. The majority's second point does not respond to the fact that the pipeline easement will forever materially restrict use of a portion of the park dedicated exclusively for recreational or educational purposes. The cases that the majority relies upon are wholly distinguishable on the facts and law and thus do not support its resolution of this case. See Ga. S. & Fla. Ry. Co. v. State Rd. Dep't, 176 So. 2d 111, 113 (Fla. Dist. Ct. App. 1965) (noting evidence demonstrating that proposed widening of highway would not interfere with railway's drainage ditches and in fact would be beneficial to railway in certain places); Lake Cty. Parks & Recreation Bd. v. Ind.-Am. Water Co., 812 N.E.2d 1118, 1122-24 (Ind. Ct. App. 2004) (holding that installation of easement for water main would only temporarily disrupt use of land for recreational hiking and bike path and thus would not interfere with public use of property "to such an extent as is tantamount to [its] destruction" (quotation omitted)).

¶ 54. As VGS conceded during oral argument, it had the burden to demonstrate that its proposed condemnation of the subject property would not materially impair the prior public use of that property. See City of Las Cruces v. El Paso Elec. Co., 1998-NMSC-006, ¶ 11, 954 P.2d 72 (noting trial court's conclusion that condemnor "had the burden of proof" as to whether its "proposed condemnation would not materially impair the public use of property sought to be condemned" (quotation omitted)); see also City of New Haven, 402 A.2d at 350 (stating longstanding rule in state "that the authority to take property by eminent domain will be strictly construed in favor of the owner and against the condemnor"). The material facts in this case are essentially undisputed. Whether, considering those facts, the proposed public use will materially impair the prior public use is a question of law. Canyon Reg. Water Auth. v. Guadalupe-Blanco River Auth., 258 S.W.3d 613, 618 (Tex. 2008). In my view, the reasonable inferences and

28

conclusions to be drawn from the undisputed facts demonstrate that the installation and maintenance of a permanent gas pipeline, coupled with the attendant use restrictions on the park imposed by the Board in the VGS easement, will materially impair the public's use of Geprags Park for recreational and educational purposes.

¶ 55.    Accordingly, I would deny VGS's petition to condemn an easement through the park for a gas pipeline without addressing the question of its necessity.

_____
Associate Justice